*649 Justice Alito
delivered the opinion of the Court.
These cases concern the interplay between two federal environmental statutes. Section 402(b) of the Clean Water Act requires that the Environmental Protection Agency transfer certain permitting powers to state authorities upon an application and a showing that nine specified criteria have been met. Section 7(a)(2) of the Endangered Species Act of 1973 provides that a federal agency must consult with agencies designated by the Secretaries of Commerce and the Interior in order to “insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species.” The question presented is whether §7(a)(2) effectively operates as a tenth criterion on which the transfer of permitting power under the first statute must be conditioned. We conclude that it does not. The transfer of permitting authority to state authorities — who will exercise that authority under continuing federal oversight to ensure compliance with relevant mandates of the Endangered Spe *650 cies Act and other federal environmental protection statutes — was proper. We therefore reverse the judgment of the United States Court of Appeals for the Ninth Circuit.
I
A
1
The Clean Water Act (CWA), 86 Stat. 816, as amended, 33 U. S. C. § 1251 et seq., established a National Pollution Discharge Elimination System (NPDES) that is designed to prevent harmful discharges into the Nation’s waters. The Environmental Protection Agency (EPA or Agency) initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials. See 33 U. S. C. § 1342; see also § 1251(b) (“It is the policy of Congress that the Stat[e]... implement the permit progra[m] under sectio[n] 1342 ... of this title”). If authority is transferred, then state officials — not the federal EPA — have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight.[1]
Under § 402(b) of the CWA, “the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to [the EPA] a foil and complete description of the program it proposes to establish and administer under State law or under an interstate compact,” as well as a certification “that the laws of such State . . . provide adequate authority to carry out the described program.” 33 U. S. C. § 1342(b). The same section provides that the EPA “shall approve each submitted program” for transfer of permitting authority to *651 a State “unless [it] determines that adequate authority does not exist” to ensure that nine specified criteria are satisfied. Ibid. These criteria all relate to whether the state agency that will be responsible for permitting has the requisite authority under state law to administer the NPDES program.[2] 2 If the criteria are met, the transfer must be approved.
2
The Endangered Species Act of 1973 (ESA), 87 Stat. 884, as amended, 16 U. S. C. § 1531 et seq., is intended to protect and conserve endangered and threatened species and their habitats. Section 4 of the ESA directs the Secretaries of Commerce and the Interior to list threatened and endangered species and to designate their critical habitats. §1533. The Fish and Wildlife Service (FWS) administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, while the National Marine Fisheries Service (NMFS) administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce. See 50 CFR §§17.11, 222.101(a), 223.102, 402.01(b) (2006).
*652 Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora. Section 7(a)(2) provides that “[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an ‘agency action’) is not likely to jeopardize the continued existence of any endangered species or threatened species.” 16 U. S. C. § 1536(a)(2).
Once the consultation process contemplated by § 7(a)(2) has been completed, the Secretary is required to give the agency a written biological opinion “setting forth the Secretary’s opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.” § 1536(b)(3)(A); see also 50 CFR §402.14(h). If the Secretary concludes that the agency action would place the listed species in jeopardy or adversely modify its critical habitat, “the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate [§ 7(a)(2)] and can be taken by the Federal agency ... in implementing the agency action.” 16 U. S. C. § 1536(b)(3)(A); see also 50 CFR § 402.14(h)(3). Regulations promulgated jointly by the Secretaries of Commerce and the Interior provide that, in order to qualify as a “reasonable and prudent alternative,” an alternative course of action must be able to be implemented in a way “consistent with the scope of the Federal agency’s legal authority and jurisdiction.” §402.02. Following the issuance of a “jeopardy” opinion, the agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U. S. C. § 1536(e). The regulations also provide that “Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.” 50 CFR § 402.03.
*653 B
1
In February 2002, Arizona officials applied for EPA authorization to administer that State’s NPDES program.[3] The EPA initiated consultation with the FWS to determine whether the transfer of permitting authority would adversely affect any listed species.
The FWS regional office concluded that the transfer of authority would not cause any direct impact on water quality that would adversely affect listed species. App. to Pet. for Cert, in No. 06-340, p. 564. However, the FWS office was concerned that the transfer could result in the issuance of more discharge permits, which would lead to more development, which in turn could have an indirect adverse effect on the habitat of certain upland species, such as the cactus ferruginous pygmy-owl and the Pima pineapple cactus. Specifically, the FWS feared that, because § 7(a)(2)’s consultation requirement does not apply to permitting decisions by state authorities,[4] the transfer of authority would empower Arizona officials to issue individual permits without considering and mitigating their indirect impact on these upland species. Id., at 565-566. The FWS regional office therefore urged that, in considering the proposed transfer of permitting authority, those involved in the consultation process should take these potential indirect impacts into account.
The EPA disagreed, maintaining that “its approval action, which is an administrative transfer of authority, [would not be] the cause of future non-discharge-related impacts on endangered species from projects requiring State NPDES permits.” Id., at 564. As a factual matter, the EPA believed *654 that the link between the transfer of permitting authority and the potential harm that could result from increased development was too attenuated. Ibid. And as a legal matter, the EPA concluded that the mandatory nature of CWA § 402(b) — which directs that the EPA “shall approve” a transfer request if that section’s nine statutory criteria are met — stripped it of authority to disapprove a transfer based on any other considerations. Id., at 564-565.
Pursuant to procedures set forth in a memorandum of understanding between the agencies, the dispute was referred to the agencies’ national offices for resolution. In December 2002, the FWS issued its biological opinion, which concluded that the requested transfer would not cause jeopardy to listed species. The opinion reasoned that “the loss of section 7-related conservation benefits ... is not an indirect effect of the authorization action,” id., at 117, because
“loss of any conservation benefit is not caused by EPA’s decision to approve the State of Arizona’s program. Rather, the absence of the section 7 process that exists with respect to Federal NPDES permits reflects Congress’ decision to grant States the right to administer these programs under state law provided the State’s program meets the requirements of [section] 402(b) of the Clean Water Act.” Id., at 114.
In addition, the FWS opined that the EPA’s continuing oversight of Arizona’s permitting program, along with other statutory protections, would adequately protect listed species and their habitats following the transfer. Id., at 101-107.
The EPA concluded that Arizona had met each of the nine statutory criteria listed in § 402(b) and approved the transfer of permitting authority. In the notice announcing the approval of the transfer, the EPA noted that the issuance of the FWS’ biological opinion had “conclude[d] the consultation process required by ESA section 7(a)(2) and reflects the *655 [FWS’] agreement with EPA that the approval of the State program meets the substantive requirements of the ESA.” Id., at 78.
2
On April 2,2003, respondents filed a petition in the United States Court of Appeals for the Ninth Circuit seeking review of the transfer pursuant to 33 U. S. C. § 1369(b)(1)(D), which allows private parties to seek direct review of the EPA’s determinations regarding state permitting programs in the federal courts of appeals. The court granted petitioner National Association of Home Builders leave to intervene as a respondent in that case. Respondent Defenders of Wildlife also filed a separate action in the United States District Court for the District of Arizona, alleging, among other things, that the biological opinion issued by the FWS in support of the proposed transfer did not comply with the ESA’s standards. The District Court severed that claim and transferred it to the Court of Appeals for the Ninth Circuit, which consolidated the case with the suit challenging the EPA transfer. See 420 F. 3d 946 (2005).
A divided panel of the Ninth Circuit held that the EPA’s approval of the transfer was arbitrary and capricious because the EPA “relied during the administrative proceedings on legally contradictory positions regarding its section 7 obligations.” Id., at 959. The court concluded that the EPA “fail[ed] to understand its own authority under section 7(a)(2) to act on behalf of listed species and their habitat,” id., at 977, because “the two propositions that underlie the EPA’s action — that (1) it must, under the [ESA], consult concerning transfers of CWA permitting authority, but (2) it is not permitted, as a matter of law, to take into account the impact on listed species in making the transfer decision — cannot both be true,” id., at 961. The court therefore concluded that it was required to “remand to the agency for a plausible explanation of its decision, based on a single, coherent interpretation of the statute.” Id., at 962.
*656 The panel majority, however, did not follow this course of action. Rather, the panel went on to review the EPA's substantive construction of the statutes at issue and held that the ESA granted the EPA both the power and the duty to determine whether its transfer decision would jeopardize threatened or endangered species. The panel did not dispute that Arizona had met the nine criteria set forth in § 402(b) of the CWA, but the panel nevertheless concluded that § 7(a)(2) of the ESA provided an “affirmative grant of authority to attend to [the] protection of listed species,” id., at 965, in effect adding a tenth criterion to those specified in § 402(b). The panel dismissed the argument that the EPA’s approval of the transfer application was not subject to § 7(a)(2) because it was not a “discretionary action” within the meaning of 50 CFR §402.03 (interpreting § 7(a)(2) to apply only to agency actions “in which there is discretionary Federal involvement or control”). 420 F. 3d, at 967-969. It viewed the FWS’ regulation as merely “coterminous” with the express statutory language encompassing all agency actions that are “ ‘authorized, funded, or carried out’ ” by the agency. Id., at 969 (quoting 16 U. S. C. § 1536(a)(2)). On these grounds, the court granted the petition and vacated the EPA’s transfer decision.
In dissent, Judge Thompson explained that the transfer decision was not a “discretionary action” under 50 CFR §402.03 because “[t]he Clean Water Act, by its very terms, permits the EPA to consider only the nine specified factors. If a state’s proposed permitting program meets the enumerated requirements,” he reasoned, “the EPA administrator ‘shall approve’ the program. 33 U. S. C. § 1342(b). This [congressional directive does not permit the EPA to impose additional conditions.” 420 F. 3d, at 980.
The Ninth Circuit denied rehearing and rehearing en banc. 450 F. 3d 394 (2006). Writing for the six judges who dissented from the denial of rehearing en banc, Judge Kozinski disagreed with the panel’s conclusion that the EPA’s analysis *657 was so internally inconsistent as to be arbitrary and capricious. He further noted that, if the panel was correct on this point, the proper resolution would have been to remand to the EPA for further explanation. Id., at 396-398. On the statutory question, Judge Kozinski echoed Judge Thompson’s conclusion that once the nine criteria set forth in § 402(b) of the CWA are satisfied, a transfer is mandatory and nondiscretionary. Id., at 397-399. He rejected the panel majority’s broad construction of ESA § 7(a)(2), concluding that “[i]f the ESA were as powerful as the majority contends, it would modify not only the EPA’s obligation under the CWA, but every categorical mandate applicable to every federal agency.” Id., at 399, n. 4.
The Ninth Circuit’s construction of § 7(a)(2) is at odds with that of other Courts of Appeals. Compare 420 F. 3d 946 (case below) with Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 962 F. 2d 27, 33-34 (CADC 1992), and American Forest & Paper Assn. v. EPA, 137 F. 3d 291, 298-299 (CA5 1998). We granted certiorari to resolve this conflict, 549 U. S. 1105 (2007), and we now reverse.
II
Before addressing this question of statutory interpretation, however, we first consider whether the Court of Appeals erred in holding that the EPA’s transfer decision was arbitrary and capricious because, in that court’s words, the agencies involved in the decision “relied... on legally contradictory positions regarding [their] section 7 obligations.” App. to Pet. for Cert, in No. 06-340, at 23.
As an initial matter, we note that if the EPA’s action was arbitrary and capricious, as the Ninth Circuit held, the proper course would have been to remand to the Agency for clarification of its reasons. See Gonzales v. Thomas, 547 U. S. 183 (2006) (per curiam). Indeed, the court below expressly recognized that this finding required it to “remand to the Agency for a plausible explanation of its decision, *658 based on a single, coherent interpretation of the statute.” App. to Pet. for Cert, in No. 06-340, at 28. But the Ninth Circuit did not take this course; instead, it jumped ahead to resolve the merits of the dispute. In so doing, it erroneously deprived the Agency of its usual administrative avenue for explaining and reconciling the arguably contradictory rationales that sometimes appear in the course of lengthy and complex administrative decisions. We need not examine this question further, however, because we conclude that the Ninth Circuit’s determination that the EPA’s action was arbitrary and capricious is not fairly supported by the record.
Review under the arbitrary and capricious standard is deferential; we will not vacate an agency’s decision unless it
“has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U. S. 29, 43 (1983).
‘We will, however, ‘uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.’” Ibid. (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U. S. 281, 286 (1974)).
The Court of Appeals concluded that the EPA’s decision was “internally inconsistent” because, in its view, the Agency stated — both during preliminary review of Arizona’s transfer application and in the Federal Register notice memorializing its final action — “that section 7 requires consultation regarding the effect of a permitting transfer on listed species.” App. to Pet. for Cert, in No. 06-340, at 23.
With regard to the various statements made by the involved agencies’ regional offices during the early stages of consideration, the only “inconsistency” respondents can point *659 to is the fact that the agencies changed their minds — something that, as long as the proper procedures were followed, they were fully entitled to do. The federal courts ordinarily are empowered to review only an agency’s final action, see 5 U. S. C. § 704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decision-making process arbitrary and capricious.
Respondents also point to the final Federal Register notice memorializing the EPA’s approval of Arizona’s transfer application. This notice stated that the FWS’ issuance of its biological opinion had “concludefd] the consultation process required by ESA section 7(a)(2).” App. to Pet. for Cert, in No. 06-340, at 73. Respondents contend that this statement is inconsistent with the EPA’s previously expressed position — and their position throughout this litigation — that §7(a)(2)’s consultation requirement is not triggered by a transfer application under § 402 of the CWA.
We are not persuaded that this statement constitutes the type of error that requires a remand. By the time the Federal Register statement was issued, the EPA had already consulted with the FWS about the Arizona application, and the question whether that consultation had been required, as opposed to voluntarily undertaken by the Agency, was simply not germane to the final agency transfer decision. The Federal Register statement, in short, was dictum, and it had no bearing on the final agency action that respondents challenge. Mindful of Congress’ admonition that in reviewing agency action, “due account shall be taken of the rule of prejudicial error,” 5 U. S. C. § 706, we do not believe that this stray statement, which could have had no effect on the underlying agency action being challenged, requires that we further delay the transfer of permitting authority to Arizona by remanding to the Agency for clarification. See also PDK Labs. Inc. v. United States Drug Enforcement Admin., 362 F. 3d 786, 799 (CADC 2004) (“In administrative law, as in *660 federal civil and criminal litigation, there is a harmless error rule”).[5]
We further disagree with respondents’ suggestion that, by allegedly altering its legal position while the Arizona transfer decision and its associated litigation was pending, the “EPA is effectively nullifying respondents’ rights to participate in administrative proceedings concerning Arizona’s application, and particularly respondents’ rights under EPA’s own regulations to comment on NPDES transfer applications.” Brief for Respondents 28 (citing 40 CFR § 123.61(b); emphasis deleted). Consistent with EPA regulations, the Agency made available “a comment period of not less than 45 days during which interested members of the public [could] express their views on the State program.” § 123.61(a)(1). Respondents do not suggest that they were deprived of their right to comment during this period.[6]
*661 Respondents also contend that if the case were remanded to the EPA, they would raise additional challenges — including, for example, a challenge to the EPA’s provision of financial assistance to Arizona for the administration of its NPDES program. However, as explained below, any such agency action is separate and independent of the agency’s decision to authorize the transfer of permitting authority pursuant to § 402(b). See n. 11, infra. We express no opinion as to the viability of a separate administrative or legal challenge to such actions.
III
A
We turn now to the substantive statutory question raised by the petitions, a question that requires us to mediate a clash of seemingly categorical — and, at first glance, irreconcilable — legislative commands. Section 402(b) of the CWA provides, without qualification, that the EPA “shall approve” a transfer application unless it determines that the State lacks adequate authority to perform the nine functions specified in the section. 33 U. S. C. § 1342(b). By its terms, the statutory language is mandatory and the list exclusive; if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application. Cf. Lopez v. Davis, 531 U. S. 230, 241 (2001) (noting Congress’ “use of a mandatory ‘shall’ ... to impose discretionless obligations”); Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U. S. 26, 35 (1998) (“[T]he mandatory ‘shall’ . . . normally creates an obligation impervious to judicial discretion”); Association of Civil Technicians v. FLRA, 22 F. 3d 1150, 1153 (CADC 1994) (“The word ‘shall’ generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive”); Black’s Law Dictionary 1375 (6th ed. 1990) (“As used in statutes ... this word is *662 generally imperative or mandatory”). Neither respondents nor the Ninth Circuit has ever disputed that Arizona satisfied each of these nine criteria. See 420 F. 3d, at 963, n. 11; Brief for Respondents 19, n. 8.
The language of § 7(a)(2) of the ESA is similarly imperative: It provides that “[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any aetion authorized, funded, or carried out by such agency ... is not likely to jeopardize” endangered or threatened species or their habitats. 16 U. S. C. § 1536(a)(2). This mandate is to be carried out through consultation and may require the agency to adopt an alternative course of action. As the author of the panel opinion below recognized, applying this language literally would “ad[dJ one [additional] requirement to the list of considerations under the Clean Water Act permitting transfer provision.” 450 F. 3d, at 404, n. 2 (Berzon, J., concurring in denial of rehearing en banc) (emphasis in original). That is, it would effectively repeal the mandatory and exclusive list of criteria set forth in § 402(b), and replace it with a new, expanded list that includes §7(a)(2)’s no-jeopardy requirement.
B
While a later enacted statute (such as the ESA),can sometimes operate to amend or even repeal an earlier statutory provision (such as the CWA), “repeals by implication are not favored” and will not be presumed unless the “intention of the legislature to repeal [is] clear and manifest.” Watt v. Alaska, 451 U. S. 259, 267 (1981) (internal quotation marks omitted). We will not infer a statutory repeal “unless the later statute ‘“expressly contradices] the original act”’ or unless such a construction ‘“is absolutely necessary ... in order that [the] words [of the later statute] shall have any meaning at all.” ’ ” Traynor v. Turnage, 485 U. S. 535, 548 (1988) (quoting Radzanower v. Touche Ross & Co., 426 U. S. *663 148, 158 (1976), in turn quoting T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874)); see also Branch v. Smith, 538 U. S. 254, 273 (2003) (“An implied repeal will only be found where provisions in two statutes are in ‘irreconcilable conflict/ or where the latter Act covers the whole subject of the earlier one and ‘is clearly intended as a substitute’”); Posadas v. National City Bank, 296 U. S. 497, 503 (1936) (“[T]he intention of the legislature to repeal must be clear and manifest”). Outside these limited circumstances, “a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.” Radzanower, supra, at 153.
Here, reading § 7(a)(2) as the Court of Appeals did would effectively repeal §402(b)’s statutory mandate by engrafting . a tenth criterion onto the CWA.[7] Section 402(b) of the CWA commands that the EPA “shall” issue a permit whenever all nine exclusive statutory prerequisites are met. Thus, § 402(b) does not just set forth minimum requirements for the transfer of permitting authority; it affirmatively mandates that the transfer “shall” be approved if the specified criteria are met. The provision operates as a ceiling as well as a floor. By adding an additional criterion, the Ninth Cir *664 cuit’s construction of § 7(a)(2) raises that floor and alters §402(b)’s statutory command.[8]
The Ninth Circuit’s reading of § 7(a)(2) would not only abrogate §402(b)’s statutory mandate, but also result in the implicit repeal of many additional otherwise categorical statutory commands. Section 7(a)(2) by its terms applies to “any action authorized, funded, or carried out by” a federal agency — covering, in effect, almost anything that an agency might do. Reading the provision broadly would thus partially override every federal statute mandating agency action by subjecting such action to the further condition that it pose no jeopardy to endangered species. See, e. g., Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 962 F. 2d, at 33-34 (considering whether § 7(a)(2) overrides the Federal Power Act’s prohibition on amending annual power licenses). While the language of § 7(a)(2) does not explicitly repeal any provision of the CWA (or any other statute), reading it for all that it might be worth runs foursquare into our presumption against implied repeals.
C
1
The agencies charged with implementing the ESA have attempted to resolve this tension through regulations imple *665 meriting § 7(a)(2). The NMFS and the FWS, acting jointly on behalf of the Secretaries of Commerce and the Interior and following notice-and-comment rulemaking procedures, have promulgated a regulation stating that “Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.” 50 CFR §402.03 (emphasis added). Pursuant to this regulation, § 7(a)(2) would not be read as impliedly repealing non-discretionary statutory mandates, even when they might result in some agency action. Rather, the ESA’s requirements would come into play only when an action results from the exercise of agency discretion. This interpretation harmonizes the statutes by giving effect to the ESA’s no-jeopardy mandate whenever an agency has discretion to do so, but not when the agency is prohibited from considering such extra-statutory factors.
We have recognized that “[t]he latitude the ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes that we owe some degree of deference to the Secretary’s reasonable interpretation” of the statutory scheme. Babbitt v. Sweet Home Chapter, Communities for Great Ore., 515 U. S. 687, 703 (1995). But such deference is appropriate only where “Congress has not directly addressed the precise question at issue” through the statutory text. Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843 (1984).
“If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. ... [However,] if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Id., at 842-843.
*666 In making the threshold determination under Chevron, “a reviewing court should not confine itself to examining a particular statutory provision in isolation.” FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120, 132 (2000). Rather, “[t]he meaning — or ambiguity — of certain words or phrases may only become evident when placed in context.... It is a ‘fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.’ ” Id., at 182-133 (quoting Davis v. Michigan Dept. of Treasury, 489 U. S. 803, 809 (1989)).
We must therefore read § 7(a)(2) of the ESA against the statutory backdrop of the many mandatory agency directives whose operation it would implicitly abrogate or repeal if it were construed as broadly as the Ninth Circuit did below. When § 7(a)(2) is read this way, we are left with a fundamental ambiguity that is not resolved by the statutory text. An agency cannot simultaneously obey the differing mandates set forth in § 7(a)(2) of the ESA and § 402(b) of the CWA, and consequently the statutory language — read in light of the canon against implied repeals — does not itself provide clear guidance as to which command must give way.
In this situation, it is appropriate to look to the implementing agency’s expert interpretation, which cabins §7(a)(2)’s application to “actions in which there is discretionary Federal involvement or control.” 50 CFR §402.03. This reading harmonizes the statutes by applying § 7(a)(2) to guide agencies’ existing discretionary authority, but not reading it to override express statutory mandates.
2
We conclude that this interpretation is reasonable in light of the statute’s text and the overall statutory scheme, and that it is therefore entitled to deference under Chevron. Section 7(a)(2) requires that an agency “insure” that the ac *667 tions it authorizes, funds, or carries out are not likely to jeopardize listed species or their habitats. To “insure” something — as the court below recognized — means “ '[t]o make certain, to secure, to guarantee (some thing, event, etc.).’” 420 F. 3d, at 963 (quoting 7 Oxford English Dictionary 1059 (2d ed. 1989)). The regulation’s focus on “discretionary” actions accords with the commonsense conclusion that, when an agency is required to do something by statute, it simply lacks the power to “insure” that such action will not jeopardize endangered species.
This reasoning is supported by our decision in Department of Transportation v. Public Citizen, 541 U. S. 752 (2004). That case concerned safety regulations that were promulgated by the Federal Motor Carrier Safety Administration (FMCSA) and had the effect of triggering a Presidential directive allowing Mexican trucks to ply their trade on United States roads. The Court held that the National Environmental Policy Act (NEPA) did not require the agency to assess the environmental effects of allowing the trucks entry because “the legally relevant cause of the entry of the Mexican trucks is not FMCSA’s action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA’s discretion.” Id., at 769 (emphasis in original). The Court concluded that “where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant ‘cause’ of the effect.” Id., at 770.
We do not suggest that Public Citizen controls the outcome here; § 7(a)(2), unlike NEPA, imposes a substantive (and not just a procedural) statutory requirement, and these cases involve agency action more directly related to environmental concerns than the FMCSA’s truck safety regulations. But the basic principle announced in Public Citizen — that an *668 agency cannot be considered the legal “cause” of an action that it has no statutory discretion not to take — supports the reasonableness of the FWS’ interpretation of § 7(a)(2) as reaching only discretionary agency actions. See also California v. United States, 438 U. S. 645, 668, n. 21 (1978) (holding that a statutory requirement that federal operating agencies conform to state water usage rules applied only to the extent that it was not “inconsistent with other congressional directives”).
3
The court below simply disregarded §402.03’s interpretation of the ESA’s reach, dismissing “the regulation’s reference to ‘discretionary ... involvement’ ” as merely “congruent with the statutory reference to actions ‘authorized, funded, or carried out’ by the agency.” 420 F. 3d, at 968. But this reading cannot be right. Agency discretion presumes that an agency can exercise “judgment” in connection with a particular action. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 415-416 (1971); see also Random House Dictionary of the English Language 411 (unabridged ed. 1967) (“discretion” defined as “the power or right to decide or act according to one’s own judgment; freedom of judgment or choice”). As the mandatory language of § 402(b) itself illustrates, not every action authorized, funded, or carried out by a federal agency is a product of that agency’s exercise of discretion.
The dissent’s interpretation of §402.03 is similarly implausible. The dissent would read the regulation as simply clarifying that discretionary agency actions are included within the scope of § 7(a)(2), but not confining the statute’s reach to such actions. See post, at 679-682. But this reading would render the regulation entirely superfluous. Nothing in either § 7(a)(2) or the other agency regulations interpreting that section, see § 402.02, suggests that discretionary actions are excluded from the scope of the ESA, and there is thus *669 no need for a separate regulation to bring them within the statute’s scope. On the dissent’s reading, §402.03’s reference to “discretionary” federal involvement is mere surplus-age, and we have cautioned against reading a text in a way that makes part of it redundant. See, e. g., TRW Inc. v. Andrews, 534 U. S. 19, 31 (2001).
This history of the regulation also supports the reading to which we defer today. As the dissent itself points out, the proposed version of §402.03 initially stated that “Section 7 and the requirements of this Part apply to all actions in which there is Federal involvement or control,” 48 Fed. Reg. 29999 (1983) (emphasis added); the Secretary of the Interior modified this language to provide (as adopted in the final rule now at issue) that the statuory requirements apply to “all actions in which there is discretionary Federal involvement or control,” 51 Fed. Reg. 19958 (1986) (emphasis added). The dissent’s reading would rob the word “discretionary” of any effect, and substitute the earlier, proposed version of the regulation for the text that was actually adopted.
In short, we read §402.03 to mean what it says: that § 7(a)(2)’s no-jeopardy duty covers only discretionary agency actions and does not attach to actions (like the NPDES permitting transfer authorization) that an agency is required by statute to undertake once certain specified triggering events have occurred. This reading not only is reasonable, inasmuch as it gives effect to the ESA’s provision, but also comports with the canon against implied repeals because it stays §7(a)(2)’s mandate where it would effectively override otherwise mandatory statutory duties.
D
Respondents argue that our opinion in TVA v. Hill, 437 U. S. 153 (1978), supports their contrary position. In that case, we held that the ESA prohibited the Tennessee Valley Authority (TVA) from putting into operation the Tellico *670 Dam — despite the fact that the agency had already spent over $100 million on the nearly completed project — because doing so would have threatened the critical habitat of the endangered snail darter. In language on which respondents rely, the Court concluded that “the ordinary meaning” of §7 of the ESA contained “no exemptions” and reflected “a conscious decision by Congress to give endangered species priority over the ‘primary missions’ of federal agencies.” Id., at 173, 185, 188.
TVA v. Hill, however, had no occasion to answer the question presented in these cases. That case was decided almost a decade before the adoption in 1986 of the regulations contained in 50 CFR § 402.03. And in any event, the construction project at issue in TVA v. Hill, while expensive, was also discretionary. The TVA argued that by continuing to make lump-sum appropriations to the TVA, some of which were informally earmarked for the Tellico Dam project, Congress had implicitly repealed §7’s no-jeopardy requirement as it applied to that project. See 437 U. S., at 189-193. The Court rejected this argument, concluding that “[t]he Appropriations Acts did not themselves identify the projects for which the sums had been appropriated” and that reports by congressional committees allegedly directing the TVA to complete the project lacked the force of law. Id., at 189, n. 35. Central to the Court’s decision was the conclusion that Congress did not mandate that the TVA put the dam into operation; there was no statutory command to that effect; and there was therefore no basis for contending that applying the ESA’s no-jeopardy requirement would implicitly repeal another affirmative congressional directive.[9]
*671 TVA v. Hill thus supports the position, expressed in §402.03, that the ESA’s no-jeopardy mandate applies to every discretionary agency action — regardless of the expense or burden its application might impose. But that case did not speak to the question whether § 7(a)(2) applies to wow-discretionary actions, like the one at issue here. The regulation set forth in 50 CFR §402.03 addressed that question, and we defer to its reasonable interpretation.
IV
Finally, respondents and their amici argue that, even if § 7(a)(2) is read to apply only to “discretionary” agency actions, the decision to transfer NPDES permitting authority to Arizona represented such an exercise of discretion. They contend that the EPA’s decision to authorize a transfer is not entirely mechanical; that it involves some exercise of judgment as to whether a State has met the criteria set forth in § 402(b); and that these criteria incorporate references to wildlife conservation that bring consideration of §7(a)(2)’s no-jeopardy mandate properly within the Agency’s discretion.
The argument is unavailing. While the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out §4Q2(b)’s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list. Nothing in the text of § 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application. And to the extent that some of the § 402(b) criteria may result in environmental benefits to ma *672 rine species,[10] there is no dispute that Arizona has satisfied each of those statutory criteria.
Respondents’ argument has been disclaimed not only by the EPA, but also by the FWS and the NMFS, the two agencies primarily charged with administering § 7(a)(2) and the drafters of the regulations implementing that section. Each agency recently issued a formal letter concluding that the authorization of an NPDES permitting transfer is not the kind of discretionary agency action that is covered by § 402.03. See App. to Pet. for Cert, in No. 06-549, at 103a-116a. An agency’s interpretation of the meaning of its own regulations is entitled to deference “unless plainly erroneous or inconsistent with the regulation,” Auer v. Robbins, 519 U. S. 452, 461 (1997) (internal quotation marks omitted), and that deferential standard is plainly met here.[11] 11
*673 * * *
Applying Chevron, we defer to the Agency’s reasonable interpretation of ESA § 7(a)(2) as applying only to “actions in which there is discretionary Federal involvement or control.” 50 CFR § 402.03. Since the transfer of NPDES permitting authority is not discretionary, but rather is mandated once a State has met the criteria set forth in § 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger §7(a)(2)’s consultation and no-jeopardy requirements. Accordingly, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and these cases are remanded for further proceedings consistent with this opinion.

It is so ordered.

 The State must advise the EPA of each permit it proposes to issue, and the EPA may object to any permit. 33 U. S. C. §§ 1342(d)(1), (2); see also 40 CFR § 123.44(c) (2006). If the State cannot address the EPA’s concerns, authority over the permit reverts to the EPA. 33 U. S. C. § 1342(d)(4).

 The State must demonstrate that it has the ability: (1) to issue fixed-term permits that apply and ensure compliance with the CWA’s substantive requirements and which are revocable for cause; (2) to inspect, monitor, and enter facilities and to require reports to the extent required by the CWA; (3) to provide for public notice and public hearings; (4) to ensure that the EPA receives notice of each permit application; (5) to ensure that any other State whose waters may be affected by the issuance of a permit may submit written recommendations and that written reasons be provided if such recommendations are not accepted; (6) to ensure that no permit is issued if the Army Corps of Engineers concludes that it would substantially impair the anchoring and navigation of navigable waters; (7) to abate violations of permits or the permit program, including through civil and criminal penalties; (8) to ensure that any permit for a discharge from a publicly owned treatment works includes conditions requiring the identification of the type and volume of certain pollutants; and (9) to ensure that any industrial user of any publicly owned treatment works will comply with certain of the GWA’s substantive provisions. §§ 1342(b)(1) — (9).

 At the time when Arizona applied, the EPA had already transferred permitting authority to local authorities in 44 other States and several United States Territories.

 By its terms, §7(a)(2)’s consultation requirement applies only to “action[s] authorized, funded, or carried out” by “Federal agencies].”

 We also note that the agencies involved have resolved any ambiguity in their positions going forward. Following the issuance of the panel’s opinion below, the EPA — in connection with the State of Alaska’s pending application for transfer of NPDES permitting authority — requested confirmation from the FWS and the NMFS of the EPA’s position that “the no-jeopardy and consultation duties of ESA Section 7(a)(2) do not apply to approval of a State’s application to administer the NPDES program,” in the apparent hope that obtaining those agencies’ views “in advance of processing Alaska’s application may avoid a repetition of” the confusion that occurred during the Arizona permitting process. App. to Pet. for Cert, in No. 06-549, pp. 96a, 95a. In response, both the FWS and the NMFS confirmed their understanding that “there is no need to conduct Section 7 consultations on proposed actions to approve State NPDES programs because such actions are not the cause of any impact on listed species and do not constitute discretionary federal agency actions to which Section 7 applies.” Id., at 107a; see also id., at 116a (NMFS “concur[s] with EPA’s conclusion that EPA is not required to engage in section 7 consultation on applications to approve State programs in situations under Section 402(b) of the CWA”).

 Nor is there any independent right to public comment with regard to consultations conducted under § 7(a)(2) — a consultation process that we conclude, in any case, was not required here. See 51 Fed. Reg. 19928 (1986) (“Nothing in section 7 authorizes or requires the Service to provide *661 for public involvement (other than that of the applicant) in the ‘inter-agency’ consultation process”).

 Justice Stevens’ dissenting opinion (hereinafter dissent) attempts to paper over this conflict by suggesting that the EPA and the agencies designated by the Secretary of the Interior could reconcile the commands of the CWA and the ESA by “generating] an alternative course of action whereby the transfer could still take place . . . but in such a way that would honor the mandatory requirements of § 7(a)(2).” Post, at 687. For example, it suggests that the EPA could condition transfers of permitting authority on the State’s acceptance of additional continuing oversight by the EPA (presumably beyond that oversight already contemplated by the CWA’s statutory language). Post, at 688-690. But such a take-it-or-leave-it approach, no less than a straightforward rejection of a transfer application, would impose conditions on an NPDES transfer beyond those set forth in § 402(b), and thus alter the CWA’s statutory command.

 It does not matter whether this alteration is characterized as an amendment or a partial repeal. Every amendment of a statute effects a partial repeal to the extent that the new statutory command displaces earlier, inconsistent commands, and we have repeatedly recognized that implied amendments are no more favored than implied repeals. See, e. g., Regional Rail Reorganization Act Cases, 419 U. S. 102, 134 (1974) (‘“A new statute will not be read as wholly or even partially amending a prior one unless there exists a “positive repugnancy” between the provisions of the new and those of the old that cannot be reconciled’ ” (quoting In re Penn Central Transp. Co., 384 F. Supp. 895, 943 (Sp. Ct. R. R. R. A. 1974))); United States v. Welden, 377 U. S. 95, 103, n. 12 (1964) (“Amendments by implication ... are not favored”); United States v. Madigan, 300 U. S. 500, 506 (1937) (“[T]he modification by implication of the settled construction of an earlier and different section is not favored”).

 The dissent is incorrect in suggesting that “if the Secretary of the Interior had not declared the snail darter an endangered species . .. the TVA surely would have been obligated to spend the additional funds that Congress appropriated to complete the project.” Post, at 676. To the contrary, the Court in TVA v. Hill found that there was no clear repug *671 nancy between the ESA and the Acts appropriating funds to the TVA because the latter simply did not require the agency to use any of the generally appropriated fluids to complete the Tellico Dam project. 437 U. S., at 189-193.

 For example, § 402(b) requires the EPA to consider whether the State has the legal authority to enforce applicable water quality standards— some of which, in turn, are informed by the “judgment” of the EPA’s Administrator. 33 U. S. C. § 1342(b)(1)(A); see also, e. g., § 1312. But the permit transfer process does not itself require scrutiny of the underlying standards or of their effect on marine or wildlife — only of the state applicant’s “authority... [t]o issue permits which... apply, and insure compliance with,” the applicable standards. § 1342(b)(1)(A) (emphasis added). In any event, respondents do not dispute that, as both the EPA and the FWS determined, the transfer of permitting authority to Arizona officials would have no adverse water quality related impact on any listed species. See App. to Pet. for Cert. in No. 06-340, at 562-563, 615-617.

 Respondents also contend that the EPA has taken, or will take, other discretionary actions apart from the transfer authorization that implicate the ESA. For example, they argue that the EPA’s alleged provision of funding to Arizona for the administration of its clean water programs is the kind of discretionary agency action that is subject to § 7(a)(2). However, assuming this is true, any such funding decision is a separate agency action that is outside the scope of this lawsuit. Respondents also point to the fact that, following the transfer of permitting authority, the EPA will retain oversight authority over the state permitting process, including the power to object to proposed permits. But the fact that the EPA may exercise discretionary oversight authority — which may trigger § 7(a)(2)’s *673 consultation and no-jeopardy obligations — after the transfer does not mean that the decision authorizing the transfer is itself discretionary.