In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2767

PATRICK J. QUINN, Governor of Illinois,

*Plaintiff-Appellant*,

*v.*

ROBERT M. GATES, Secretary of Defense, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-3190—**Richard Mills**, *Judge*.

ARGUED JUNE 3, 2009—DECIDED JULY 29, 2009

Before EASTERBROOK, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Shuttering a military base is a difficult task. Whatever the long-term benefit to national security and the fisc, the economy of the area near a closed base suffers. Members of the congressional delegation rally to their constituents' support. Because keeping any one base going imposes very little cost (per person) on the rest of the populace, this support may be

effective. Everyone favors closing bases in other districts while protecting their own bases, but that outcome is not feasible. The upshot may be that all bases remain open, even though everyone could gain by a process that spreads the hurt widely to achieve a long-term gain for the nation as a whole.

After a series of ill-fated attempts to rationalize the cross-state allocation of military resources, Congress enacted the Defense Base Closure and Realignment Act of 1990, 104 Stat. 1808, note following 10 U.S.C. §2687. The Act creates a Commission charged with recommending changes that save money and improve national security. Both the President and the Congress may approve or reject the Commission's proposal, but they cannot amend it. The Commission dissolves when it delivers its report to the President. If either the President or Congress rejects the proposal, the process ends; but if both approve (more precisely, if the President transmits the proposal to Congress and the legislature does not cancel the plan by joint resolution), then the Secretary of Defense must implement the changes. This design mitigates the local-interest problems that had so often derailed sensible policy. The Commission must recommend a package in which the national gains outweigh local losses. The reason for banning amendments is obvious, and the provision disbanding the Commission once it delivers a recommendation reinforces the bar against amendments. (A "nay" by President or Congress would function as an amendatory power if the Commission could make alternative proposals.) In short, Congress designed the Act to force the President and its own membership into an all-or-none decision.

Base consolidations under the Act have occurred in 1991, 1993, 1995, and 2005. In this most recent round, the Commission recommended closing 22 bases and realigning another 33, saving $35 billion over 20 years. *2005 Defense Base Closure and Realignment Commission Report*. The President transmitted the Plan, and Congress let it go into force. One of the Plan's changes is the subject of this suit: the Secretary of Defense must move fifteen F–16 jets from a base in Springfield, Illinois—where they were assigned to a wing of the Illinois Air National Guard—to a base in Fort Wayne, Indiana. According to the Commission, this change reflects "a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements" in Fort Wayne.

In 2005 Illinois' Governor brought this suit, asking the district court to enjoin the Commission from transmitting its proposals to the President. He contended that 32 U.S.C. §104(c) prohibits redeployment without gubernatorial consent, which was not given. Section 104(c) allows the President to "designate" the National Guard units in a state "by branch of the Army or organization of the Air Force", with the proviso that any "change in the branch, organization, or allotment of a unit" requires approval from the affected state's governor. The Governor contends that the F–16s are an "allotment of a unit" and that redistribution is a "change", making the Plan illegal to the extent it requires moving the jets. (The Governor also relied on 10 U.S.C. §18238, but that statute is no longer in issue.)

The district court denied the Governor's request for immediate relief, and we declined to issue an injunction pending appeal. We observed that §104(c) does not prohibit the Commission (or anyone else) from making recommendations to the President. If the Governor's understanding of §104(c) is correct, the proper remedy is an order maintaining the planes in Illinois. The district court then dismissed the suit for want of standing, holding that moving the F–16s would not injure the Governor. 385 F. Supp. 2d 768 (C.D. Ill. 2005). We reversed in an unpublished order, because refusing to recognize a procedural right (here, an asserted veto power) is a form of injury. *Blagojevich v. Rumsfeld*, No. 05-3595 (7th Cir. Nov. 1, 2006). On remand the district court again dismissed the suit, again on jurisdictional grounds, after concluding that sovereign immunity blocks the litigation. We reversed a second time, *Blagojevich v. Gates*, 519 F.3d 370 (7th Cir. 2008), explaining that sovereign immunity is not a jurisdictional issue and has at all events been waived by 5 U.S.C. §702. We remanded with instructions to decide the case on the merits. (In a separate proceeding, we denied the Governor's request for an injunction keeping the planes in Illinois pending further action in the district court, because they can be flown back if the Governor prevails.)

For a third time, the district court dismissed the suit for lack of subject-matter jurisdiction. 558 F. Supp. 2d 885 (C.D. Ill. 2008). This time the rationale was that the Act precludes judicial review of the Secretary's actions implementing an approved plan. The court thought this outcome compelled by the logic of Justice Souter's con-

currence in *Dalton v. Specter*, 511 U.S. 462 (1994). In compliance with our mandate to address the merits, the judge also held that §104(c) does not give the Governor a veto power over the transfer of particular equipment. Because we find Justice Souter's analysis compelling, it is unnecessary to assess how §104(c) affects the movement of military equipment outside the Realignment Act's framework.

Plaintiffs in *Specter* (including the eponymous Senator) asked for an injunction to prevent the Secretary from closing the Philadelphia Naval Shipyard, as the 1991 Plan required. They argued that the Secretary and Commission failed to observe all of the Act's procedures, and that the President thus should not have approved their recommendation. All nine Justices voted to deny relief. The majority held (1) that the Commission's recommendation to the President is not final agency action reviewable under the Administrative Procedure Act, for unless the President and Congress approve the Commission's plan nothing happens, and (2) that the President and Congress are not agencies whose decisions are reviewable under the APA. Justice Souter, joined by Justices Blackmun, Stevens, and Ginsburg, preferred to decide on a different ground: that the Realignment Act grants the President "unfettered discretion to accept the Commission's base-closing report or to reject it, for a good reason, a bad reason, or no reason". 511 U.S. at 483. The concurring Justices saw the suit as an effort at cherry picking and concluded that the Act forbids any remedy that would undermine its all-or-none approach.

The Secretary's order to move the F–16s to Indiana is final agency action, and the Department of Defense is an APA "agency". Invoking Justice Souter's opinion, the Secretary supports the district court's conclusion that the federal judiciary lacks jurisdiction to review even final action implementing a base closure. But Justice Souter did not say this; his position is that the Act requires decisions to be implemented en bloc, not that judges are powerless to enforce the Act's terms.

Nothing in the Act modifies the many statutes that confer jurisdiction over claims arising under federal statutes. Suppose the President failed to accept or reject the Commission's proposal as a package—a requirement under the Act—but instead deleted two closures and ordered the Secretary to close a base that the Commission proposed to keep open. Execution of that order would be incompatible with the Act and could be enjoined. Or suppose the Commission proposed to save money by quartering the soldiers of a given base in the homes of local citizens. The third amendment would prohibit that—and given the Act's all-or-none rule the entire plan might be enjoined. The Realignment Act does not limit recourse to the courts on such matters; the point of Justice Souter's opinion was only that judges must not usurp the President's policy-making function and must respect the Act's all-or-none feature.

Subject-matter jurisdiction is the authority to resolve the parties' dispute. *Collins v. United States*, 564 F.3d 833 (7th Cir. 2009). Sometimes the ground on which this resolution occurs is that decision belongs to another

governmental actor. Consider, for example, the provision exempting from the APA action "committed to agency discretion by law." 5 U.S.C. §701(a)(2). That supplies a ground on which the dispute must be resolved (the agency's decision prevails) without contracting federal subject-matter jurisdiction. Likewise here: to say that the Realignment Act's structure supersedes other statutes that might have allowed some bases on the President's list to remain open is not to say that any jurisdiction has been withdrawn. A litigant whose claim is blocked by substantive provisions in a statute loses on the merits, not for lack of jurisdiction. See *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

In several recent decisions the Supreme Court has observed with regret that the term "jurisdictional" is often loosely used, even in some of its own opinions, to signify any mandatory rule of decision. *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006); *Eberhart v. United States*, 546 U.S. 12 (2005); *Kontrick v. Ryan*, 540 U.S. 443 (2004); see also *Wisconsin Valley Improvement Co. v. United States*, 569 F.3d 331, 333–34 (7th Cir. 2009). The footnoted aside in *Block v. Community Nutrition Institute*, 467 U.S. 340, 353 n.4 (1984), describing reviewability as "in effect" jurisdictional, is precisely the kind of "drive-by jurisdictional ruling" (*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 91 (1998)) that cases such as *Arbaugh* tell us to disregard. See *Wisconsin Valley*, 569 F.3d at 334 (coming to the same conclusion about *Block v. North Dakota*, 461 U.S. 273 (1983)).

District courts have jurisdiction to hear civil actions against the United States and its agencies arising under

federal law, when the plaintiff seeks relief other than money. 28 U.S.C. §1346(a)(2). This is such a case. See also 28 U.S.C. §1331; 5 U.S.C. §702 (permitting "[a] person suffering legal wrong because of agency action" to sue for injunctive relief). So our 2008 opinion said. 519 F.3d at 371. Any non-frivolous claim arising under federal law supplies jurisdiction. See *Steel Co.*; *Bell v. Hood*, 327 U.S. 678, 682–83 (1946). The Governor's understanding of §104(c) might be erroneous, or relief might be blocked by the Realignment Act, but the suit is not frivolous. That's why our 2008 opinion concluded that the district court possesses subject-matter jurisdiction.

The question squarely presented is whether the Realignment Act supersedes whatever limits §104(c) puts on the President's power to redeploy federal equipment assigned to a unit of the National Guard. An affirmative answer does not mean that the Realignment Act "implicitly repeals" §104(c); the statutes can coexist. Cf. *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). Section 104(c) retains its force if the President wishes to change an "allotment" outside the process established by the Realignment Act. But the Secretary may be authorized to bypass §104(c) when implementing a proposal made and adopted under the Realignment Act.

The Governor says that the base-closing power under that Act is subject to all other limits on presidential authority. This argument rests on the premise that implied repeals are disfavored. See, e.g., *Home Builders*; *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978). The

presumption is sound but unhelpful, because the Act does not "repeal" §104(c). Instead it provides a means, independent of other statutes, by which bases may be closed or realigned. It is common ground, or at least should be, that a later-enacted statute can confine the domain of an earlier one. E.g., *Brotherhood of Maintenance of Way Employees v. CSX Transportation, Inc.*, 478 F.3d 814 (7th Cir. 2007); *Katz v. Gerardi*, 552 F.3d 558 (7th Cir. 2009). To the extent of incompatibility, an old rule generally yields to a new one. *Katz*, 552 F.3d at 561. (The Governor says that the statutes are not inconsistent, because the President *could* exercise his authority under the Realignment Act by disapproving the Commission's recommendation if any Governor objects to the realignment of any National Guard unit. But that begs the relevant question, which is whether the President must jump through hoops established by older statutes that were designed to frustrate base closures.)

Is there any reason why the most recent statute should not govern? The Governor wheels out the interpretive canon *expressio unius est exclusio alterius*. Section 2905(c)(1) of the Realignment Act permits the President to approve a plan without preparing an environmental-impact statement under the National Environmental Policy Act of 1969. The Realignment Act is silent about §104(c). Because the Act mentions one statute it displaces, the argument goes, all others must be unaffected.

We read the Realignment Act's treatment of NEPA as an argument against the Governor rather than in his favor. The subsection immediately following the exemption we describe says: "The provisions of [NEPA] shall

apply to actions of the Department of Defense under this part (i) during the process of property disposal, and (ii) during the process of relocating functions from a military installation being closed or realigned". §2905(c)(2)(A). In tandem, subsections (c)(1) and (c)(2)(A) say that NEPA remains effective to the extent that environmental analysis would not disrupt or delay the process of selecting bases for closure and realignment. The Realignment Act had to address NEPA in order to draw this distinction and preserve its application in part.

One might invert the Governor's argument and say that statutory rules predating 1990 are superseded unless the Realignment Act expressly notes their applicability. But neither "all older statutes apply unless mentioned in the Realignment Act" nor "no older statute applies unless. . ." captures Justice Souter's point. What he concluded—and what we, too, conclude—is that the Realignment Act supersedes any statute that is incompatible with the Act's all-or-none feature. The Act is designed to ensure that "action on a base-closing package be quick and final". *Specter*, 511 U.S. at 479 (Souter, J., concurring). The Governor invokes §104(c) for the declared purpose of excluding one base from the Commission's program, while bases in other states are closed. The Realignment Act forbids that sort of outcome. The judgment of the district court is modified to be on the merits and as so modified is

AFFIRMED.