DAVIS, Senior Circuit Judge,
concurring:
I am pleased to join in full the majority’s holding that the Patient Protection and Affordable Care Act (the Act) “permits” the Internal Revenue Service to decide whether premium tax credits should be available to consumers who purchase health insurance coverage on federally-run Exchanges. Maj. Op. at 373. But I am also persuaded that, even if one takes the view that the Act is not ambiguous in the manner and for the reasons described, the necessary outcome of this case is precisely the same. That is, I would hold that Congress has mandated in the Act that the IRS provide tax credits to all consumers regardless of whether the Exchange on which they purchased their health insurance coverage is a creature of the state or the federal bureaucracy. Accordingly, at Chevron Step One, the IRS Rule making the tax credits available to all consumers of Exchange-purchased health insurance coverage, 26 C.F.R. § 1.36B-l(k), 77 Fed. Reg. 30,377, 30,378 (May 23, 2012), is the correct interpretation of the Act and is required as a matter of law. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
Although the Act expressly contemplates state-run Exchanges, ACA § 1311(b)(1), Congress created a contingency provision that permits the federal government, via the Secretary of Health and Human Services, to “establish and operate such Exchange within the State and ... take such actions as are necessary to *377 implement such other requirements.” Id. § 1321(c)(1). This contingency provision is triggered when a state elects not to set up an Exchange, when a state is delayed in setting up an Exchange, or when a state Exchange fails to meet certain statutory and regulatory requirements. Id. § 1321(c)(1).
Enter the premium tax credits, essentially a tax subsidy for the purchase of health insurance. The amended tax code, 26 U.S.C. § 36B(b), sets forth the formula for calculating the amount of a consumer’s premium tax credit. In general, the credit is equal to the lesser of two amounts: the monthly premium for a qualified health plan “enrolled in through an Exchange established by the State,” or the excess of the adjusted monthly premium for a certain type of health plan over a percentage of the taxpayer’s household income. Id. § 36B(b)(2).
Appellants contend that the language “enrolled in through an Exchange established by the State” precludes the IRS from providing premium tax credits to consumers who purchase health insurance coverage on federal Exchanges. To them, “established by the State” in the premium tax credits calculation subprovision is the sine qua non of this case. An Exchange established by the State is not an Exchange established by the federal government, they argue; thus, the equation for calculating the amount of the premium tax credit is wholly inapplicable to all consumers who purchase health insurance coverage on federally-run Exchanges (the amount would be zero, according to Appellants).
I am not persuaded and for a simple reason: “[Ejstablished by the State” indeed means established by the state-except when it does not, i.e., except when a state has failed to establish an Exchange and when the Secretary, charged with acting pursuant to a contingency for which Congress planned, id. § 1321(c), establishes and operates the Exchange in place of the state. When a state elects not to establish an Exchange, the contingency provision authorizes federal officials to establish and operate “such Exchange” and to take any action adjunct to doing so.
That disposes of the Appellants’ contention. This is not a case that calls up the decades-long clashes between textualists, purposivists, and other schools of statutory interpretation. See Abbe Gluck, The States As Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism, 119 Yale L.J. 1750, 1762-63 (2010). The case can be resolved through a contextual reading of a few different subsections of the statute. If there were any remaining doubt over this construction, the bill’s structure dispels it: The contingency provision at § 1321(c)(1) is set forth in “Part III” of the bill, titled “State Flexibility Relating to Exchanges,” a section that appears after the section that creates the Exchanges and mandates that they be operated by state governments, ACA § 1311(b). What’s more, the contingency provision does not create two-tiers of Exchanges; there is no indication that Congress intended the federally-operated Exchanges to be lesser Exchanges and for consumers who utilize them to be less entitled to important benefits. Thus, I conclude that a holistic reading of the Act’s text and proper attention to its structure lead to only one sensible conclusion: The premium tax credits must be available to consumers who purchase health insurance coverage through their designated Exchange regardless of whether the Exchange is state- or federally-operated.
The majority opinion understandably engages with the Appellants and respectfully posits they could be perceived to advance a plausible construction of the Act, i.e., that Congress may have sought to restrict the *378 scope of the contingency provision when it used the phrase “established by the State” in the premium tax credits calculation sub-provision. But as the majority opinion deftly illustrates, a straightforward reading of the Act strips away any and all possible explanations for why Congress would have intended to exclude consumers who purchase health insurance coverage on federally-run Exchanges from qualifying for premium tax credits. (The best Appellants can come up with seems to be some non-existent Congressional desire for “state leadership” (whatever that means) in effecting a comprehensive overhaul of the nation’s health insurance marketplaces and related health care markets.) Such a reading, the majority opinion persuasively explains, is not supported by the legislative history or by the overall structure of the Act. Maj. Op. at 372, 370-71. Moreover, the majority carefully and cogently explains how “widely available tax credits are essential to fulfilling the Act’s primary goals and [how] Congress was aware of their importance when drafting the bill.” Maj. Op. at 374. Thus, the majority correctly holds that Congress did not intend a reading that has no legislative history to support it and runs contrary to the Act’s text, structure, and goals. Appellants’ “literal reading” of the premium tax credits calculation subprovision renders the entire Congressional scheme nonsensical. Cf. Maj. Op. at 372.
In fact, Appellants’ reading is not literal; it’s cramped. No case stands for the proposition that literal readings should take place in a vacuum, acontextually, and untethered from other parts of the operative text; indeed, the case law indicates the opposite. National Association of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 666, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007). So does common sense: If I ask for pizza from Pizza Hut for lunch but clarify that I would be fine with a pizza from Domino’s, and I then specify that I want ham and pepperoni on my pizza from Pizza Hut, my friend who returns from Domino’s with a ham and pepperoni pizza has still complied with a literal construction of my lunch order. That is this ease: Congress specified that Exchanges should be established and run by the states, but the contingency provision permits federal officials to act in place of the state when it fails to establish an Exchange. The premium tax credit calculation subprovision later specifies certain conditions regarding state-run Exchanges, but that does not mean that a literal reading of that provision somehow precludes its applicability to substitute federally-run Exchanges or erases the contingency provision out of the statute.
That Congress sometimes specified state and federal Exchanges in the bill is as unremarkable as it is unrevealing. This was, after all, a 900-page bill that purported to restructure the means of providing health care in this country. Neither the canons of construction nor any empirical analysis suggests that congressional drafting is a perfectly harmonious, symmetrical, and elegant endeavor. See generally Abbe Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside: An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L.Rev. 901 (2013). Sausage-makers are indeed offended when their craft is linked to legislating. Robert Pear, If Only Laws Were Like Sausages, N.Y. Times, Dec. 5, 2010, at WK3. At worst, the drafters’ perceived inconsistencies (if that is what they are at all) are far less probative of Congress’ intent than the unqualified and broad contingency provision.
Appellants insist that the use of “established by the State” in the premium tax credits calculation subprovision is evidence of Congress’ intent to limit the availability of tax credits to consumers of state Ex *379 change-purchased health insurance coverage. Their reading bespeaks a deeply flawed effort to squeeze the proverbial elephant into the proverbial mousehole. Whitman v. American Trucking Associations, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). If Congress wanted to create a two-tiered Exchange system, it would have done so expressly in the section of the Act that authorizes the creation of contingent, federally-run Exchanges. If Congress wanted to limit the availability of premium tax credits to consumers who purchase health coverage on state-run Exchanges, it would have said so rather than tinkering with the formula in a subprovision governing how to calculate the amount of the credit.
The real danger in the Appellants’ proposed interpretation of the Act is that it misses the forest for the trees by eliding Congress’ central purpose in enacting the Act: to radically restructure the American health care market with “the most expansive social legislation enacted in decades.” Sheryl Gay Stolberg & Robert Pear, Obama Signs Health Care Overhaul Into Law, With a Flourish, N.Y. Times, March 24, 2010, at A19. The widespread availability of premium tax credits was intended as a critical part of the bill, a point the President highlighted at the bill signing. Transcript of Remarks by the President and Vice President at Signing of the Health Insurance Reform Bill, March 23, 2010 (“And when this exchange is up and running, millions of people will get tax breaks to help them afford coverage, which represents the largest middle-class tax cut for health care in history. That’s what this reform is about.”). Appellants’ approach would effectively destroy the statute by promulgating a new rule that makes premium tax credits unavailable to consumers who purchased health coverage on federal Exchanges. But of course, as their counsel largely conceded at oral argument, that is their not so transparent purpose.
Appellants, citizens of the Commonwealth of Virginia, do not wish to buy health insurance. Most assuredly, they have the right, but not the unfettered right, Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S. -, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), to decline to do so. They have a clear choice, one afforded by the admittedly less-than-perfect representative process ordained by our constitutional structure: they can either pay the relatively minimal amounts needed to obtain health care insurance as provided by the Act, or they can refuse to pay and run the risk of incurring a tiny tax penalty. Id. What they may not do is rely on our help to deny to millions of Americans desperately-needed health insurance through a tortured, nonsensical construction of a federal statute whose manifest purpose, as revealed by the wholeness and coherence of its text and structure, could not be more clear.
As elaborated in this separate opinion, I am pleased to concur in full in Judge Gregory’s carefully reasoned opinion for the panel.