**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AKIAK NATIVE COMMUNITY;
NUNAMTA AULUKESTAI; NONDALTON
TRIBAL COUNCIL; CURYUNG TRIBAL
COUNCIL; COOK INLETKEEPER;
ALASKA CENTER FOR THE
ENVIRONMENT; ALASKA COMMUNITY
ACTION ON TOXICS; CENTER FOR
BIOLOGICAL DIVERSITY; THE
CENTER FOR WATER ADVOCACY,
                    *Petitioners,*

EKWOK TRIBAL COUNCIL; NEW            No. 08-74872
STUYAHOK TRADITIONAL COUNCIL;
PRINCE WILLIAM SOUNDKEEPER,            OPINION
                    *Intervenors,*

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; STEPHEN L.
JOHNSON, Administrator of the U.S.
Environmental Protection Agency,
                    *Respondents,*

STATE OF ALASKA,
                    *Intervenor.*

On Petition for Review of a Decision of the
United States Environmental Protection Agency

Argued and Submitted
July 28, 2010—Anchorage, Alaska

Filed November 4, 2010

18249

Before: Mary M. Schroeder, Diarmuid F. O'Scannlain and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Schroeder

**COUNSEL**

Emily Anderson and Victoria Clark (argued), Trustees for Alaska, Anchorage, Alaska, for the petitioners and petitioner-intervenors.

John C. Cruden and Kenneth C. Amaditz (argued), United States Department of Justice, Washington, D.C., for the respondents.

Daniel S. Sullivan and Cameron M. Leonard (argued), State of Alaska, Fairbanks, Alaska, for the respondent-intervenor.

---

**OPINION**

CLIFTON, Circuit Judge:

Petitioner Akiak Native Community and other petitioners and intervenors (collectively "Petitioners" or "Akiak") seek review of the approval by the United States Environmental Protection Agency ("EPA") of the State of Alaska's application to assume responsibility for administration of portions of the National Pollutant Discharge Elimination System ("NPDES"), pursuant to section 402(b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1342(b). Petitioners contend that the EPA did not adequately ensure (1) that Alaska state law will provide the same opportunities for judicial review of permitting decisions as required by federal law, (2) that the State has the necessary enforcement tools to abate permit violations, and (3) that subsistence resources will be protected as mandated by the Alaskan National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 *et seq.* We conclude that the EPA's decision to transfer authority to the State of Alaska was not arbitrary or capricious. Accordingly, we deny the petition for review.

## I.  Background

The NPDES program was established as part of the CWA to regulate the discharge of pollutants into the navigable waters of the United States. 33 U.S.C. § 1342. The EPA initially administered the NPDES permitting program in each state, but the CWA expressly provides that permitting authority shall be transferred to state officials upon a showing that the state has met the specified criteria for transfer. *Id.* § 1342(b); *see also id.* § 1251(b) ("It is the policy of Congress that the Stat[e] . . . implement the permit progra[m] under sectio[n] 1342 . . . of this title."). "If authority is transferred, then state officials—-not the federal EPA—-have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife ("Home Builders")*, 551 U.S. 644, 650 (2007). As of this time, 46 states, including Alaska, have been authorized to administer the NPDES program. *See* U.S. Environmental Protection Agency, NPDES State Program Status, http://cfpub.epa.gov/npdes/statestats.cfm (last visited Oct. 26, 2010).

Section 402(b) of the CWA sets forth the approval process and criteria by which the EPA must evaluate state program applications. 33 U.S.C. § 1342(b); *see also* 40 C.F.R. § 123.1. In its application, a state must submit "a full and complete description of the program it proposes to establish and administer under State law." 33 U.S.C. § 1342(b). A state must also certify "that the laws of such State . . . provide adequate authority to carry out the described program." *Id.* The EPA "shall approve" each state application "unless [the EPA] determines that adequate authority does not exist" under State law to perform nine specified categories of functions in connection with the state's administration of the NPDES program. *Id.* § 1342(b)(1)-(9). "If the criteria are met, the transfer must be approved." *Home Builders*, 551 U.S. at 651.

Once a state's program has been approved, permitting authority is given to the state, but the EPA retains oversight

over the state program and it may object to any individual permit if it does not comply with the requirements of the CWA. 33 U.S.C. § 1342(d)(2)(B). Additionally, if a state is not administering its permitting program in accordance with the CWA, the EPA may withdraw its approval of the program as a whole. *Id.* § 1342(c)(3).

The State of Alaska initially submitted an application to the EPA in 2006 to administer a state program, referred to as the Alaska Pollutant Discharge Elimination System ("APDES"). The EPA deemed this application incomplete. The State resubmitted its application on May 1, 2008, and the EPA, on finding the application complete, held a 60-day notice and comment period beginning on June 18, 2008. The EPA also held three public hearings in Alaska. After receiving comments, the EPA published a Response to Comments document.

The EPA approved the State of Alaska's application to administer the APDES program on October 31, 2008, finding the proposed program met all the requirements of section 402(b) of the CWA. The permitting program was delegated to the State on November 7, 2008, with the State assuming control over the program in four phases beginning in 2008 and ending in 2011.[1]

Akiak filed a timely petition for review. The State of Alaska moved to intervene in support of the EPA and the Ekwok Tribal Council and others moved to intervene in support of Petitioners. The motions to intervene were granted.

---

[1]The State's APDES program will not entirely replace the EPA. Under the terms of the EPA's approval, the federal agency will retain NPDES permitting authority and primary enforcement responsibility for the biosolids program; facilities operating in the Denali National Park and Preserve pursuant to Alaska Statehood Act Section 11; facilities discharging in Indian Country as defined in 18 U.S.C. § 1151; facilities operating outside state waters (three miles offshore); and facilities with CWA section 301(h) waivers.

## II.   Discussion

Challenges to EPA actions under section 509(b) of the CWA, 33 U.S.C. § 1369(b), are reviewed under the arbitrary and capricious standard of the Administrative Procedure Act. *Am. Mining Cong. v. EPA*, 965 F.2d 759, 763 (9th Cir. 1992). "Review under the arbitrary and capricious standard is deferential; we will not vacate an agency's decision unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Home Builders*, 551 U.S. at 658 (internal quotation marks omitted).

### A.   Judicial Review

**[1]** The CWA mandates that the EPA encourage "[p]ublic participation in development, revision, and enforcement of any regulation." 33 U.S.C. § 1251(e). Before transferring the NPDES program to a state, the CWA requires, as one of the nine criteria a state must meet for transfer of the NPDES program, that a state has the ability to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1342(b)(7). The implementing regulations regarding transfer of the NPDES program specify that:

> All states that administer or seek to administer a program under this part shall provide an opportunity for judicial review in State Court of the final approval or denial of permits by the State that is sufficient to provide for, encourage, and assist public participation in the permitting process. A State will meet this standard if State law allows an opportunity for judicial review that is the same as that available to obtain judicial review in federal court of a federally-issued

> NPDES permit (see § 509 of the Clean Water Act).
> A State will not meet this standard if it narrowly
> restricts the class of persons who may challenge the
> approval or denial of permits (for example, if only
> the permittee can obtain judicial review, if persons
> must demonstrate injury to a pecuniary interest in
> order to obtain judicial review, or if persons must
> have a property interest in close proximity to a dis-
> charge or surface waters in order to obtain judicial
> review.)

40 C.F.R. § 123.30.[2]

Akiak and the EPA disagree over the meaning of this regu-
lation. Petitioners argue that the language sets forth two spe-
cific standards that stem from the general mandate to promote
public participation in the permitting process. They contend
that the regulation requires that a state program provide "an
opportunity for judicial review that is the same as that avail-
able to obtain judicial review under federal law," and they
point to the regulation's reference to section 509 of the CWA,
33 U.S.C. § 1369, to argue that a state must provide the fed-
eral standard for awards of attorney's fees in public interest
suits before the NPDES program may be transferred.

The Supreme Court, in order to protect citizen involvement
in public interest suits, has established a federal fee-shifting
"dual standard" that directs courts to award attorney's fees to
a prevailing plaintiff in normal circumstances, but only to a
prevailing defendant if the action was "frivolous, unreason-

---

[2]Judicial review of permitting decisions is not discussed in section
402(b) of the CWA, the section of the statute providing the criteria by
which the EPA must evaluate a state's program application. 33 U.S.C.
§ 1342(b). Judicial review was addressed in an amendment of the imple-
menting regulation for section 402(b) after the EPA became aware of
standing requirements in certain states that had the potential to inhibit citi-
zens' access to judicial review of permit decisions. *See* 61 Fed. Reg.
20,972-74 (May 8, 1996).

able, or groundless, or [if the] plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978). Under this standard, an unsuccessful plaintiff who acted in good faith is generally not at risk of having to pay the other side's attorney's fees. The language of section 509 of the CWA does not specifically set forth a dual standard for attorney's fees, for it states that "the court may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party whenever it determines that such award is appropriate." 33 U.S.C. § 1369(b)(3). We have interpreted section 509 to require the *Christiansburg* "dual standard," however. *See Saint John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1063-64, n.1 (9th Cir. 2009). Thus an unsuccessful challenge under section 509 brought in federal court will ordinarily not result in a fee award against the plaintiff who brought the challenge.

In contrast, Alaska has a "loser pays" rule, a system sometimes described as the "English rule," to govern the award of attorney's fees for civil actions in state court. *See* Alaska Stat. § 09.60.010; Alaska R. Civ. P. 82(a). Petitioners argue that the Alaska "loser pays" system of attorney fee-shifting does not provide citizens the same opportunities for judicial review as are available under federal law because public interest plaintiffs will be deterred in at least some instances by the risk of being liable for substantial sums under the "loser pays" rule in state court.

**[2]** The EPA disagrees with Akiak's interpretation of the regulation, arguing that 40 C.F.R. § 123.30 establishes a general standard for evaluating state programs with its language calling for judicial review that is "sufficient to provide for, encourage, and assist public participation in the permitting process." The EPA contends that the following two sentences of the regulation, quoted above, identify state rules that are defined as acceptable and unacceptable. The EPA interprets these sentences to offer a safe harbor for what is permissible

(i.e., an opportunity for judicial review in the given state's court that is the same as that available in federal court) and an explicit statement of something that is impermissible (a narrow restriction on who may challenge the approval or denial of permits). Between those extremes, according to the EPA, is a range of possible state judicial review procedures that are not identical to those in section 509 of the CWA, but do not narrowly restrict the class of persons who may challenge permitting decisions. Under the EPA's interpretation of the regulation, providing an opportunity for judicial review equal to that available in federal court is defined to be acceptable, but is not necessarily required. If judicial review of a permitting decision by the State is less than what would be available in federal court, the EPA argues that the agency can exercise its discretion in determining whether the state program meets the general standard.

**[3]** The EPA's interpretation is the more logical reading of the regulation. The regulation says that a State program will be acceptable if it is subject to judicial review equal to that available to challenge a federal permit decision; it does not say that a State program will not be acceptable if it is not. Even if we concluded that the regulation were ambiguous, the EPA's interpretation of its own regulation is entitled to deference under the standard established in *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulations" (internal quotation marks omitted)).

**[4]** The question that remains is whether the State of Alaska's program meets the general standard of ensuring it will "provide for, encourage, and assist public participation in the permitting process," as required by 40 C.F.R. § 123.30. The EPA decided that the State of Alaska's proposed program, though perhaps not subject to exactly the same opportunity for judicial review that is available for a federally-issued permit, still provides for meaningful public participation in the permitting process. We conclude that the EPA's determina-

tion was not arbitrary or capricious. Petitioners have not demonstrated that there will be an inadequate opportunity for public participation if the state assumes the responsibility for the relevant portions of the NPDES program.

Petitioners' challenge has focused on the potential impact of Alaska's unusual provisions regarding the award of attorney's fees. As already noted, Alaska has, generally speaking, adopted a "loser pays" rule for attorney's fees. Examined closely, though, it turns out that Alaska law is not quite that simple. Further, it is very difficult to say what impact the application of Alaska law would actually have on public participation and on the availability of judicial review if the State is allowed to assume responsibility for the NPDES program. Alaska law on this subject has been in flux.

Alaska Rule of Civil Procedure 82 establishes the fee-shifting approach for state trial courts under which "the prevailing party in a civil case shall be awarded attorney's fees."[3]

(Text continued on page 18262)

---

[3]Rule 82 of the Alaska Rules of Civil Procedure provides:

(a) Allowance to Prevailing Party. Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.

(b) Amount of Award.

(1) The court shall adhere to the following schedule in fixing the award of attorney's fees to a party recovering a money judgment in a case:

|  | Judgment and, if Awarded, Prejudgment Interest | Contested With Trial | Contested Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $25,000 | 20% | 18% | 10% |
| Next | $75,000 | 10% | 8% | 3% |
| Next | $400,000 | 10% | 6% | 2% |
| Over | $500,000 | 10% | 2% | 1% |

(2) In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred, and shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred. The actual fees shall include fees for legal work customarily performed by an attorney but which was delegated to and performed by an investigator, paralegal or law clerk.

(3) The court may vary an attorney's fee award calculated under subparagraph (b)(1) or (2) of this rule if, upon consideration of the factors listed below, the court determines a variation is warranted by:

(A) the complexity of the litigation;

(B) the length of trial;

(C) the reasonableness of the attorneys' hourly rates and the number of hours expended;

(D) the reasonableness of the number of attorneys used;

(E) the attorneys' efforts to minimize fees;

(F) the reasonableness of the claims and defenses pursued by each side;

(G) vexatious or bad faith conduct;

(H) the relationship between the amount of work performed and the significance of the matters at stake;

(I) the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts;

(J) the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party or its insurer; and

(K) other equitable factors deemed relevant.

If the court varies an award, the court shall explain the reasons for the variation.

(4) Upon entry of judgment by default, the plaintiff may recover an award calculated under subparagraph (b)(1) or its reasonable actual fees which were necessarily incurred, whichever is less. Actual fees include fees for

However, Rule 82(b)(3) provides that the court may vary an attorney's fee award based upon eleven identified factors. Of particular relevance to the current case are the factors listed in subsection (I) "the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter

legal work performed by an investigator, paralegal, or law clerk, as provided in subparagraph (b)(2).

(c) Motions for Attorney's Fees. A motion is required for an award of attorney's fees under this rule or pursuant to contract, statute, regulation, or law. The motion must be filed within 10 days after the date shown in the clerk's certificate of distribution on the judgment as defined by Civil Rule 58.1. Failure to move for attorney's fees within 10 days, or such additional time as the court may allow, shall be construed as a waiver of the party's right to recover attorney's fees. A motion for attorney's fees in a default case must specify actual fees.

(d) Determination of Award. Attorney's fees upon entry of judgment by default may be determined by the clerk. In all other matters the court shall determine attorney's fees.

(e) Equitable Apportionment Under AS 09.17.080. In a case in which damages are apportioned among the parties under AS 09.17.080, the fees awarded to the plaintiff under (b)(1) of this rule must also be apportioned among the parties according to their respective percentages of fault. If the plaintiff did not assert a direct claim against a third-party defendant brought into the action under Civil Rule 14(c), then

(1) the plaintiff is not entitled to recover the portion of the fee award apportioned to that party; and

(2) the court shall award attorney's fees between the third-party plaintiff and the third-party defendant as follows:

  (A) if no fault was apportioned to the third-party defendant, the third-party defendant is entitled to recover attorney's fees calculated under (b)(2) of this rule;

  (B) if fault was apportioned to the third-party defendant, the third-party plaintiff is entitled to recover under (b)(2) of this rule 30 or 20 percent of that party's actual attorney's fees incurred in asserting the claim against the third-party defendant.

(f) Effect of Rule. The allowance of attorney's fees by the court in conformance with this rule shall not be construed as fixing the fees between attorney and client.

similarly situated litigants from the voluntary use of the courts," and subsection (K) "other equitable factors deemed relevant."

For many years Alaska courts recognized a limited public interest exception to Rule 82 which applied in cases where: "(1) the case was designed to effectuate strong public policies; (2) numerous people would benefit if the litigant succeeded; (3) only a private party could be expected to bring the suit; and (4) the litigant lacked sufficient economic incentive to bring suit." *Matanuska Elec. Ass'n, Inc. v. Rewire the Bd.*, 36 P.3d 685, 696 (Alaska 2001). This exception allowed an award of full attorney's fees for a prevailing public interest plaintiff and denied an award of attorney's fees to a prevailing defendant if the public interest plaintiff litigated in good faith. *See Anchorage v. McCabe*, 568 P.2d 986, 990 (Alaska 1977); *Gilbert v. State*, 526 P.2d 1131, 1136 (Alaska 1974).

In 2003, the Alaska Legislature enacted House Bill 145, which barred courts from relying on the public interest litigant exception and the four factors identified by the Alaska Supreme Court and quoted above. *See* Alaska Stat. § 09.60.010(b); ch. 86, § 2, SLA 2003. The Alaska Supreme Court upheld the validity of HB 145, concluding that it was "valid insofar as it abrogates the public interest exception developed by the decisions of this court." *State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 404 (Alaska 2007). The court also acknowledged that "a limiting interpretation should be given [to] Rule 82(b)(3)(K) relating to the use of 'other equitable factors' to vary a fee award . . . [such] that courts must take care to avoid using this equitable power as an indirect means of accomplishing what HB 145 has now disallowed." *Id*. at 405.

However, the court also noted that HB 145 did not modify the text of Rule 82. *Id*. It stated that HB 145 "ma[de] no change to subsection (b)(3)(I) [and] [t]his subsection continues to apply to all cases, without discriminating between those

brought for self-interested reasons and those intended to effectuate public policies." *Id.* at 406. The court concluded:

> [A]lthough HB 145 abrogates, in part, the public interest litigant exception, litigants advancing public interest claims may still, on a case-by-case basis, be shielded from awards of attorney's fees under Rule 82(b)(3)(I) for much the same reason that we accepted when we first adopted the exception in its original protective form: awarding fees in public interest cases may deter citizens from litigating questions of general public concern.

*Id.* (internal quotation marks and footnote omitted).

At this time, there is scant evidence of how, in practice, attorney's fees have been assessed in public interest cases following the passage of HB 145 and the Alaska Supreme Court's interpretation of the act in *Nunapitchuk*.

To further complicate the question before us, Rule 82 only applies to trial courts in Alaska. Appeals from administrative agencies—the form which challenges to permits issued by the state would presumably take—are governed by Alaska Rule of Appellate Procedure 508(e), which provides that "[a]ttorney's fees may be allowed in an amount to be determined by the court."[4] *See Stalnaker v. Williams*, 960 P.2d 590, 597 (Alaska 1998) ("A superior court hearing an appeal from an administrative agency awards attorney's fees under

---

[4]Rule 508(e) of the Alaska Rules of Appellate Procedure provides, in full:

(e) Attorney's Fees. Attorney's fees may be allowed in an amount to be determined by the court. If such an allowance is made, the clerk shall issue an appropriate order awarding fees at the same time that an opinion or an order under Rule 214 is filed. If the court determines that an appeal or cross-appeal is frivolous or that it has been brought simply for purposes of delay, actual attorney's fees may be awarded to the appellee or cross-appellee.

Appellate Rule 508, not Civil Rule 82."). Rule 508 allows courts "broad discretion in awarding fees." *Miller v. Matanuska-Susitna Borough*, 54 P.3d 285, 293 (Alaska 2002). The Alaska Supreme Court previously held that Rule 82 provided a guideline for appellate courts to determine a "reasonable" award in cases where there has been no money judgment, *Carr-Gottstein Prop. v. State*, 899 P.2d 136, 148 (Alaska 1995), but that was before the enactment of HB 145 and the Alaska Supreme Court's interpretation of the act in *Nunapitchuk*. We do not know what Alaska courts will do about awarding fees for administrative appeals brought by public interest groups in the future or, more specifically, whether and to what extent HB 145 will have a deterrent effect on public participation in the APDES permitting process.

The State of Alaska did provide, as part of its application to assume control over the NPDES program, a program description in which it declared that it will not seek attorney's fees from permit challengers who pursue unsuccessful appeals "unless the appeal was frivolous or brought simply for purposes of delay." The State can be held to that pledge.

The State's pledge does not rule out the possibility of a fee application by an intervenor in litigation. Say, for example, that a permit issued by the State under the APDES program was challenged in Alaska courts by some public interest group, that the private party who obtained the permit intervened in the action, and the court affirmed the issuance of the permit without holding the challenge to be frivolous or interposed solely for delay. The State has pledged not to seek fees in such a circumstance, but that promise does not prevent the intervening private party from doing so. If the court were to award substantial fees to that party from the public interest group, future public interest challenges could be deterred. We have not, however, been presented with evidence that Alaska courts have in the past awarded substantial sums in attorney's fees to prevailing third-party intervenors.

The State also declared in its program description that "Rule 82(b)(3)(I) has particular relevance to consideration of any potential attorneys' fees award against litigants whose good faith appeal of an APDES permit proves unsuccessful." In effect, the State sought to reassure the EPA that the threat of fee awards against public interest permit challengers is not substantial enough to conclude that the opportunity for judicial review in Alaska courts would be effectively diminished.

**[5]** The EPA approved the APDES program as described in the State's application. Under the circumstances, although there is some uncertainty about the possibility of future attorney's fee awards, we cannot conclude that the EPA's decision was arbitrary or capricious. It was not unreasonable to conclude, based on what was known to EPA when it approved the application—or based on what we know now—that Alaska provides "an opportunity for judicial review in State Court of the final approval or denial of permits by the State that is sufficient to provide for, encourage, and assist public participation in the permitting process." 40 C.F.R. § 123.30.

We note, in particular, that in giving its approval, the EPA did not sign a blank check. The APDES program is subject to "continuing EPA oversight," and the EPA may withdraw its approval of the program should the EPA determine at any point that the APDES program does not meet the standards mandated in the CWA. *See Home Builders*, 551 U.S. at 650. Indeed, the statute expressly directs that should the EPA determine that "a State is not administering a program approved under [the CWA], [the EPA] shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, [the EPA] shall withdraw approval of such program." 33 U.S.C. § 1342(c)(3). We assume that EPA will take this responsibility seriously.

## B.  Administrative Penalty Authority

As noted above, section 402(b) of the CWA requires, as one of the nine criteria specified for the evaluation of a state's

proposed program, that the EPA determine whether such submitted program has adequate authority "to abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1342(b)(7); *see also* 40 C.F.R. § 123.27.

Petitioners argue that the EPA failed to ensure that the State of Alaska had adequate enforcement tools to abate violations, as required by the CWA. Petitioners point to the fact that state officials lack the ability to assess civil penalties administratively. *See* Alaska Stat. § 46.03.760(e). Indeed, the State must initiate a legal proceeding to impose a civil penalty against a permit violator. *Id.* In contrast, under the CWA the EPA may assess civil penalties administratively without a court proceeding. 33 U.S.C. § 1319(g).

**[6]** There is no requirement in the CWA or its regulations that state officials have the authority to impose an administrative penalty, however. The language of the statute says nothing about administrative penalties, and the regulations provide that administrative assessment of penalties by a state are "not mandatory [but] highly recommended." 40 C.F.R. § 123.27(c) (Note). Given that the regulation explicitly says that administrative assessments are "not mandatory," the lack of authority to impose administrative penalties cannot by itself require the denial of the state's application. Moreover, the EPA has identified two other "highly recommended" means of enforcement: suing to recover costs related to remedial efforts and suing for compensation for environmental damage, 40 C.F.R. § 123.27.(c) (Note), both of which are expressly permitted by Alaska law. Alaska Stat. § 46.03.760. Since Alaska law enables the State to sue permit violators, there is no reason to conclude that Alaska lacks adequate enforcement remedies.

## C. ANILCA

Petitioners also argue that the EPA failed to uphold the federal government's duty under ANILCA to protect subsistence

resources in Alaska's navigable waters. ANILCA was enacted in 1980 with the "primary purpose . . . to complete the allocation of federal lands in the State of Alaska." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 549 (1987). By asserting control over federal public lands in Alaska, Congress aimed to "provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so," among other purposes. 16 U.S.C. § 3101(c). The subsistence provisions of ANILCA, *id.* §§ 3111-3126, establish an administrative framework through which rural residents may be involved with the management of wildlife on public lands. *See id.* § 3111.

[7] Section 810 of ANILCA establishes a procedure for federal agencies to evaluate the effects of federal land use on subsistence resources. Specifically, section 810 provides in relevant part:

> In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.

16 U.S.C. § 3120(a). Before performing any activity covered by section 810(a), the federal agency must provide notice and a hearing and must determine that "(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes

of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." *Id*. § 3120(a)(3).

The Supreme Court's recent decision in *Home Builders* provides guidance as to whether the EPA's transfer of the NPDES program to the State of Alaska triggers the requirement of a subsistence evaluation under ANILCA. In *Home Builders*, public interest groups challenged the EPA's transfer of the NPDES program to the State of Arizona, arguing that the EPA failed to consider the effects such transfer would have on endangered and threatened species under section 7(a) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a). 551 U.S. at 649. The Supreme Court held that requiring the EPA to comply with section 7(a) of the ESA would place the CWA and the ESA in conflict, for it would add a tenth criteria to the nine established criteria a state program must meet for transfer approval under section 402(b) of the CWA, 33 U.S.C. § 1342(b). *Id*. at 663-64. The Court noted that "§ 402(b) does not just set forth *minimum* requirements for the transfer of permitting authority; it affirmatively mandates that the transfer 'shall' be approved if the specified criteria are met." *Id*. at 663. The Court concluded that requiring compliance with section 7(a) would "effectively repeal § 402(b)'s statutory mandate by engrafting a tenth criterion onto the CWA." *Id*.

**[8]** Requiring the EPA to consider section 810 of ANILCA would also add a tenth criterion to the CWA's requirements and therefore alter section 402(b)'s statutory command. As the Court states in *Home Builders*, "[w]hile a later enacted statute . . . can sometimes operate to amend or even repeal an earlier statutory provision (such as the CWA), repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." *Id*. at 662 (internal quotation marks omitted). The EPA's transfer of the NPDES program to the State of Alaska therefore does not trigger a subsistence evaluation under ANILCA.

Akiak argues that the CWA should not be interpreted to repeal ANILCA's subsistence protection mandates because CWA is a statute of general application and ANILCA is a specific statute. *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). The Supreme Court made the distinction between general and specific statutes in *Morton*, however, by noting that the Indian preference statute was specific because it "appl[ied] to a very specific situation," while the Indian Reorganization Act was of "general application." *Id.* at 550. Here, the CWA is the more specific statute with regard to the transfer of the NPDES permitting program because it lists specific criteria for the EPA to consider when evaluating a state program application for transfer of authority, while ANILCA does not address either the transfer from the EPA to a state or the NPDES program as a whole.

Furthermore, there is no indication that the EPA was required to conduct subsistence evaluations under ANILCA when it previously retained authority over the NPDES program before transferring it to the State of Alaska. Indeed, the EPA does not have "primary jurisdiction" over "public lands" in Alaska, and that is what triggers the application of ANILCA under section 810(a). From a reading of the statute, it appears that ANILCA applies specifically to federal land management agencies. *See* 16 U.S.C. § 3102(12) ("The term 'Secretary' means the Secretary of the Interior, except that when such term is used with respect to any unit of the National Forest System, such term means the Secretary of Agriculture."); *Id.* § 3112(3) (declaring as part of the "Congressional statement of policy" that "[f]ederal land managing agencies, in managing subsistence activities on the public lands . . . shall cooperate with adjacent landowners and land managers"); *Id.* § 3120(d) (noting that after performing the subsistence evaluation mandated by section 810, "the head of the appropriate Federal agency may manage or dispose of

public lands under his primary jurisdiction"). The EPA does not directly manage public lands and is not a federal land management agency.[5]

## III.   Conclusion

**[9]** The EPA's decision to approve the State of Alaska's proposed program to administer the NPDES permitting system was not arbitrary or capricious.

## PETITION FOR REVIEW DENIED.

---

[5]In *City of Angoon v. Hodel*, we explicitly rejected the notion that the CWA's issuance of a pollution permit triggers a subsistence evaluation under section 810(a) of ANILCA. 803 F.2d 1016, 1027-28 (9th Cir. 1986). We noted that the CWA did not require such evaluation because the federal government did not hold title to the navigational servitude and therefore the servitude was not "public land" within the meaning of ANILCA. *Id.* at 1027 n.6. We further stated that even if we were to conduct a broad reading of the meaning of "public lands," neither the EPA nor the Army Corps of Engineers qualified as an agency having "primary jurisdiction" over the public lands at issue, which were privately-held lands within a National Monument managed by the U.S. Forest Service. *Id.* at 1028.

Petitioners argue that *City of Angoon* is not controlling here because this court in *Alaska v. Babbitt* expanded the definition of "public lands" to include certain federal navigable waters. In *Babbitt*, we held that "the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." 72 F.3d 698, 704 (9th Cir. 1995). Specifically, we held that ANILCA applies to federal navigable waters adjacent to, or within the exterior boundaries of, federal reservations in Alaska. *See id.*; 36 C.F.R. § 242.3(b). These federal reservations and enclaves are primarily controlled by federal land management agencies, however, and not the EPA. *See* 94 C.J.S. Waters § 347 ("The federal reserved water rights doctrine or implied reservation doctrine applies not only to Indian reservations, but to other federal enclaves, such as national parks, forests, monuments, military bases, and wildlife preserves."). The EPA therefore was not required to conduct subsistence evaluations under ANLICA.

SCHROEDER, Circuit Judge, dissenting in part:

I agree that the ANILCA provision and the lack of administrative penalties in Alaska law do not undermine the grant of NPDES authority from the EPA to the State of Alaska, but I strongly disagree with the majority's conclusion that Alaska's "loser pays" attorney's fee system will not adversely affect the public's ability to bring state court challenges to permitting decisions.

Federal law on attorneys fees in public interest cases provides a dual standard that does not require a plaintiff to pay the fees of a defendant unless the plaintiff's action was frivolous. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978). As the Majority notes, "[w]e have interpreted section 509 [of the CWA] to require the *Christiansburg* 'dual standard.' " Majority Op. at 18258 (citing *Saint John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1063-64, n.1 (9th Cir. 2009)). This rule is intended to encourage access to the courts. *Id.* at 1062 (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)).

The CWA itself mandates that

> [p]ublic participation in the development, revision, and enforcement of any regulation . . . established by the Administrator or any State . . . shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

33 U.S.C. § 1251(e). The relevant regulation is clear that state law can not materially limit the public's ability to challenge permitting decisions:

> All States that administer or seek to administer a program under this part shall provide an opportunity

for judicial review in State Court of the final approval or denial of permits by the State that is sufficient to provide for, encourage, and assist public participation in the permitting process. A State will meet this standard if State law allows an opportunity for judicial review that is the same as that available to obtain judicial review in federal court of a federally-issued NPDES permit (see § 509 of the Clean Water Act). A State will not meet this standard if it narrowly restricts the class of persons who may challenge the approval or denial of permits (for example, if only the permittee can obtain judicial review, if persons must demonstrate injury to a pecuniary interest in order to obtain judicial review, or if persons must have a property interest in close proximity to a discharge or surface waters in order to obtain judicial review).

40 C.F.R. § 123.20. Thus if the state law is the same as the federal standard it passes muster. If it expressly defines only a narrow class of plaintiffs with standing, it does not.

Alaska law effectively offers access to the state court only to those members of the public or public interest groups who are able and willing to risk the substantial financial burden of paying attorneys fees. In my view, this does not meet the regulatory standard and hence the delegation was arbitrary and capricious and not in accordance with the applicable law.

It is not enough for the state to "pledge" that is will not seek fees against losing plaintiffs. Majority Op. at 18265. As the majority opinion itself recognizes, the state cannot speak for the myriad private interests who participate in environmental litigation of this nature. *Id.* at 18265. Nor is it enough that an Alaskan state court may "on a case-by-case basis" protect a losing challenger from fees. *State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 406 (Alaska 2007). The Alaska legislature has in fact repudiated the Alaska common law that

recognized a public interest exception to the "loser pays" rule. *See* Alaska Stat. § 09.60.010(b); ch. 86, § 2, SLA 2003.

I fully recognize that the EPA can, and will, monitor the aftermath of its grant of vast authority to the limited resources of the state of Alaska. *Compare* ALASKA'S OFFICE OF MGMT & BUDGET, STATE OF ALASKA: FY2010 GOVERNOR'S OPERATING BUDGET, 4 (2008), http://www.gov.state.ak.us/omb/10_omb/budget/-DEC/dept18.pdf (Alaska's Department of Environmental Conservation's total FY2010 Budget of $74.1 Million) *with* ENVIRONMENTAL PROTECTION AGENCY, FY2010 EPA BUDGET IN BRIEF, 6 (2009) (EPA's total FY2010 Budget of $10,486 Million). Yet the environmental demands facing this nation at the present time are staggering and federal resources too are strained. For a state the size of Alaska, whose name "comes from an Aleut word, Alashka, meaning 'great land,' " Peter A. Dratch & Terry D. DeBruyn, *Alaska: A Great Land for Wildlife*, ENDANGERED SPECIES BULLETIN, Jan.–Feb. 2002, at 12, these pressures are felt on a colossal scale:

> With an area of 570,374 square miles (1,477,262 sq. km), Alaska is by far the largest state in the United States, about 2.3 times the size of Texas and one-fifth the size of the contiguous United States . . . Alaska boasts approximately 33,000 miles (53,108 km) of shoreline, more than all of the contiguous United States . . . Freshwater, in both liquid and frozen form, is abundant in Alaska, which has more than 3 million lakes, 12,000 rivers, innumerable streams, creeks, and ponds, as well as thousands of square miles of glaciated area.

MARTHA SHULSKI & GERD WENDLER, THE CLIMATE OF ALASKA 3-8 (2007). Robust public participation, as mandated by Congress, is necessary to protect Alaska's vast ecosystem, including its shores and waterways. Because Alaska's proposed program to administer the NPDES permitting system fails to satisfy Congress's explicit public participation mandate, I respectfully dissent.