**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALASKA ESKIMO WHALING COMMISSION, *Petitioner*, | No. 13-70633 |
| v. | OPINION |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; LISA P. JACKSON, Administrator; DENNIS J. MCLERRAN, Region 10 Administrator, *Respondents*, | |
| SHELL OFFSHORE, INC.; SHELL GULF OF MEXICO, INC.; CONOCOPHILLIPS COMPANY, *Respondents-Intervenors*. | |

On Petition for Review of a Permit of the
Environmental Protection Agency

Argued and Submitted
May 13, 2015—Anchorage, Alaska

Filed June 29, 2015

Before: William C. Canby, Jr., Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Canby

## SUMMARY[*]

### Environmental Law

The panel granted in part and denied in part a petition for review brought by the Alaska Eskimo Whaling Commission, challenging the Beaufort Permit issued by the U.S. Environmental Protection Agency under the National Pollutant Discharge Elimination System provisions of the Clean Water Act, authorizing the discharge of oil and gas exploration facilities of 13 waste streams into marine waters of the Beaufort Sea in accordance with conditions set forth in the Permit.

The panel granted the petition on one issue on which the EPA admitted error in the record, and remanded to the EPA for a determination regarding whether the discharge of non-contact cooling water (alone or in combination with other authorized discharges) into the Beaufort Sea will cause unreasonable degradation of the marine environment because of the effect of such discharge on bowhead whales, including deflection from their migratory paths.

The panel denied the petition in all other respects because the EPA's issuance of the Permit was otherwise supported by the record evidence, did not reflect a failure to consider an important respect of the problem, and was not otherwise arbitrary or capricious.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Christopher G. Winter (argued) and Layla Hughes, Crag Law Center, Portland, Oregon, for Petitioner.

Daniel Pinkston (argued), United States Department of Justice, Denver, Colorado; Sam Hirsch, Acting Assistant Attorney General; Angeline Purdy, Environmental Defense Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Kimberly A. Owens, Assistant Regional Counsel, United States Environmental Protection Agency—Region 10, Seattle, Washington, for Respondents.

Kyle W. Parker (argued), Sarah Bordelon, Crowell & Moring LLP, Anchorage, Alaska; Cameron Leonard, Perkins Coie LLP, Anchorage, Alaska, for Respondents-Intervenors Shell Gulf of Mexico Inc. and Shell Offshore Inc.

Svend A. Brandt-Erichsen, Meline G. MacCurdy, Marten Law PLLC, Seattle, Washington, for Respondent-Intervenor ConocoPhillips Company.

**OPINION**

CANBY, Senior Circuit Judge:

The Alaska Eskimo Whaling Commission ("AEWC"), representing certain  Alaska Native villages that engage in subsistence hunting of bowhead whales, petitions for review of the Beaufort Permit ("the Permit") issued by the Environmental Protection Agency under the National Pollutant Discharge Elimination System ("NPDES") provisions of the Clean Water Act.  The Permit authorizes the discharge by oil and gas exploration facilities of 13 waste streams into marine waters of the Beaufort Sea in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the Permit.  AEWC does not seek to have the Permit vacated, but asks us to remand it to the EPA for further proceedings leading to additional restrictions on discharges.  We have jurisdiction to review the EPA's issuance of the Permit pursuant to 33 U.S.C. § 1369(b)(1)(F). We deny in great part AEWC's petition, but we grant on one issue on which the EPA has admitted an error in the record: we remand to the EPA for a determination regarding whether the discharge of non-contact cooling water (alone or in combination with other authorized discharges) into the Beaufort Sea will cause unreasonable degradation of the marine environment, 40 C.F.R. § 125.121(e), because of the effect of such discharge on bowhead whales, including deflection from their migratory paths. We deny the petition in all other respects.

## I.  Background

Following the 2011 expiration of the 2006 Arctic NPDES general permit for offshore oil and gas exploration, the EPA

replaced that permit with two separate general permits for exploration discharges: one for the Beaufort Sea and one for the Chuckchi Sea. Only the Beaufort Permit is the subject of this appeal. The Permit allows discharges only in connection with oil exploration; actual oil development and offshore production are not within the Permit.

In January 2012, the EPA issued for public review and comment a draft of the Beaufort Permit. During the three-month comment period, public meetings were held and testimony was taken in communities, including the Nuiqsut Community, on the North Slope and in Anchorage. AEWC and several other organizations also submitted to the EPA extensive written comments on the draft Permit.

In October 2012, the EPA issued the Permit (Permit No. AKG282100) pursuant to Sections 402 and 403 of the Clean Water Act, 33 U.S.C. §§ 1342, 1343. The Permit authorizes the discharge of 13 waste streams[1] "in accordance with the effluent limitations, monitoring requirements, and other

---

[1] The permitted discharges are numbered and described as follows:

    001 Water-Based Drilling Fluids and Drill Cuttings
    002 Deck Drainage
    003 Sanitary Wastes
    004 Domestic Wastes
    005 Desalination Unit Wastes
    006 Blowout Preventer Fluid
    007 Boiler Blowdown
    008 Fire Control System Test Water
    009 Non-contact Cooling Water
    010 Uncontaminated Ballast Water
    011 Bilge Water
    012 Excess Cement Slurry
    013 Muds, Cuttings, Cement at the Seafloor

conditions" set forth therein, and it is effective from November 28, 2012 through November 27, 2017. The Permit includes one limitation and one monitoring requirement relevant to the issues on appeal. First, the Permit imposes a seasonal limitation on Discharge 001 (water-based drilling fluids and drill cuttings), prohibiting all such discharge "during fall bowhead whale hunting in the Beaufort Sea by the Nuiqsut and Kaktovik communities." Second, the Permit requires permittees to monitor "to the maximum extent possible" for possible deflection of marine mammals when discharging Discharge 001 and Discharge 009 (non-contact cooling water). The Permit provides that it may be modified or revoked "if, on the basis of any new data, the Director or DEC determines that continued discharges may cause unreasonable degradation of the marine environment."

AEWC now appeals, arguing that the EPA failed to consider adequately the extent to which discharges authorized under the Permit will interfere with subsistence uses of the Beaufort Sea, particularly the subsistence communities' fall hunt for bowhead whales. AEWC contends that the permitted discharges will divert the whales far from their normal seasonal migratory routes, making the hunting of them less productive and far more dangerous. AEWC challenges the EPA's failure to include in the Permit the following two sets of restrictions: first, a total prohibition ("zero discharge restriction") on the discharge of six of the thirteen authorized waste streams: drilling fluids and cuttings (No. 001), sanitary and domestic waste (Nos. 003, 004), ballast water (No. 010), bilge water (No. 011), and certain muds, cuttings, cement at the seafloor (No. 013); and second, a prohibition during the fall bowhead hunting season of the discharge of an additional five waste streams: non-contact cooling water (No. 009) and, if not brought within the zero discharge restriction, sanitary

and domestic waste (Nos. 003, 004), bilge water (No. 011), and certain muds, cuttings, cement at the seafloor (No. 013).

"Challenges to EPA actions under section 509(b) of the Clean Water Act, 33 U.S.C. § 1369(b), are reviewed under the arbitrary and capricious standard of the Administrative Procedure Act." *Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1165 (9th Cir. 2010). Under this deferential standard of review, we "'will not vacate an agency's decision unless it has [1] relied on factors which Congress had not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (internal quotation marks omitted)).

## II. The Error in the Record

Along with the Permit, the EPA issued three documents that, taken together, explain the bases for the EPA's permitting decision: (1) its Response to Comments, which includes the EPA's responses to all comments it received; (2) its Ocean Discharge Criteria Evaluation, issued "to review the discharges authorized under [the Permit] and evaluate their potential [to] cause unreasonable degradation of the marine environment[,]"; and (3) its Environmental Justice Analysis in support of the Permit. In its response to a comment requesting a seasonal restriction on the discharge of non-contact cooling water and related chemicals, sanitary and domestic wastes, and bilge water, "because these waste streams risk deflecting bowhead whales from their migratory paths," the EPA stated that it "concluded that non-contact

cooling water will not result in an unreasonable degradation to the marine environment due to the permit restrictions and monitoring requirements placed on this discharge and because temperature is expected to dissipate and achieve complete mixing within 100 meters of the discharge location." Similarly, in the Ocean Discharge Criteria Evaluation, the EPA stated that it used a model to evaluate the dilution of all the drilling-related effluents associated with each of the discharges authorized by the Beaufort general permit, and that "[t]he predicted dilution for th[e] worst-case scenario was approximately 600:1 at 100 meters from the discharge point."

On the eve of oral argument, the EPA filed with this court a letter in which it candidly acknowledged its discovery of a misstatement in the record and in its brief. In its letter, the EPA reported that the modeling it cited in support of its statements that the temperature of cooling water would dissipate and mix within 100 meters of discharge, and that all discharges would dilute to a ratio of 600:1 within 100 meters of discharge, in fact did not include non-contact cooling water in the model. That model was for drilling-related effluents, not cooling water. EPA's letter further stated that cooling water was included in other modeling that applied to a wide range of discharges. An attachment to the letter contained a table ("Table 6") that included a list of numbers and figures for the temperature effects at various cooling water discharges.

Under the controlling rule for the review of administrative agency actions, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those

grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *SEC v. Chenery Corp. (Chenery II)*, 332 U.S. 194, 196 (1947). We must remand rather than combing the record for evidence on which the agency may have relied. *Id.*

Here, neither the EPA's letter and its attachment, nor the EPA's representations at oral argument, explained the import of the agency's error.  In addition to the table in its attachment, the letter discusses a list of other figures and tables in the Further Excerpts of Record.  These figures and tables are no substitute for the agency's on-the-record explanation of what the evidence showed and how that evidence supports its ultimate conclusions.  The EPA's erroneous statement that cooling water would be mixed and diluted to a ratio of 600:1 suggested that this level of mixing and dilution was unlikely to change the behavior of bowhead whales.  We are unable to extract a similar conclusion from the figures supplied or referred to in the EPA's letter.  With the record in this posture, we cannot properly answer the question whether the EPA's error affected its decision.  We conclude, therefore, that the error in the record to which the EPA drew our attention requires remand to address the issue involved.

We remand to the EPA to reconsider, in light of its acknowledged error, its determination that discharge of non-contact cooling water (alone or along with other authorized discharges) will not cause unreasonable degradation of the marine environment, and to identify evidence in the record sufficient to support its reconsidered decision concerning the possible effect, or non-effect, of the discharge of non-contact

cooling water on the bowhead whale migration and subsistence hunting season in the Beaufort Sea.

For the reasons and in the manner discussed below, we deny the petition for review in all other respects.

### III.  Adherence to Statutory Criteria

The Clean Water Act requires the EPA to promulgate guidelines for determining degradation of marine waters, which shall address several considerations listed in the statute.  33 U.S.C. § 1343(c)(1)(A)–(G).  AEWC argues that the EPA erred in failing to base its decision on two of these considerations, "the effect of disposal[] of pollutants on esthetic, recreation, and economic values," *id.* § 1343(c)(1)(C), and "the effect on alternate uses of the oceans, such as mineral exploitation and scientific study," *id.* § 1343(c)(1)(G).

AEWC's argument misses the mark.  The organic statute sets forth the considerations that EPA was to follow when promulgating its own regulations, not the criteria that EPA must apply to each permitting decision it makes.  AEWC disclaims any *Chevron*-style challenge to EPA's regulations under the statute.  Thus, we are tasked only with deciding whether EPA's application of its regulatory criteria to the permitting decision challenged here was arbitrary or capricious.

### IV.  Adherence to Regulatory Criteria

The remainder of AEWC's arguments challenge the EPA's consideration of the record evidence in light of the regulatory requirements for the issuance of NPDES permits,

40 C.F.R. § 125.123, and the "unreasonable degradation" criteria set out in the implementing regulations, 40 C.F.R. § 125.122.

## A

The EPA issued the Permit under paragraph (a) of 40 C.F.R. § 125.123, which provides in pertinent part:

> (a) If the director on the basis of available information . . . determines prior to permit issuance that the discharge will not cause unreasonable degradation of the marine environment after application of any necessary conditions specified in § 125.123(d), he may issue an NPDES permit containing such conditions.

The EPA did not purport to act under paragraph (c), which provides in pertinent part:

> (c) If the director has insufficient information to determine prior to permit issuance that there will be no unreasonable degradation of the marine environment . . . there shall be no discharge of pollutants into the marine environment unless the director on the basis of available information . . . determines that:
>
> > (1) Such discharge will not cause irreparable harm to the marine environment during the period in which monitoring is undertaken, and

(2) There are no reasonable alternatives to the on-site disposal of these materials, and

(3) The discharge will be in compliance with all permit conditions established pursuant to paragraph (d) of this section.

Paragraph (d) then provides certain conditions that are mandatory for permits issued pursuant to paragraph (c), including a monitoring program to assess the impact of the discharge on aquatic life, and a clause providing for revocation of the permit if the director determines at any time that continued discharges may cause unreasonable degradation of the marine environment.

Proceeding under paragraph (a), the director determined on the basis of available information that the discharge would not cause unreasonable degradation of the marine environment after the monitoring condition and cancellation clause of paragraph (d) were added to the Permit. EPA accordingly issued the Permit.

AEWC argues that, because the EPA applied two conditions specified in paragraph (d), the EPA somehow became subject to paragraph (c) and its requirement that the director determine that there were no reasonable alternatives to on-site disposal of materials. This contention, however, simply is not what the regulations provide. The director was free to impose two conditions specified in paragraph (d), as paragraph (a) authorized. Nothing in the regulations provides that proceeding in such a manner somehow converts a paragraph (a) proceeding to a paragraph (c) proceeding.

Accordingly, should the EPA determine on remand that available information still supports its determination that discharges will not cause unreasonable degradation of the marine environment, there is no error in its decision to proceed under subsection (a). If, however, the EPA determines on remand that the record does not contain sufficient "available information" to support its determination that "the discharge[s] will not cause unreasonable degradation of the marine environment after application of any necessary conditions specified in § 125.123(d)," 40 C.F.R. § 125.123(a), its issuance of the Permit pursuant to subsection (a) cannot stand, and it will be obliged to proceed under subsection (c) and conduct the alternatives analysis and meet the other requirements for permit determinations under that subsection.

## B

The main thrust of AEWC's remaining arguments is that the EPA's decision regarding discharges other than non-contact cooling water was not adequately supported by the evidence. AEWC also argues that the EPA did not provide a rational explanation of how the monitoring program will prevent conflicts with subsistence uses and that the EPA's reliance on the monitoring program is arbitrary and irrational. These arguments stress the EPA's acknowledgment of record evidence indicating the discharges may conflict with subsistence uses.

The Clean Water Act's implementing regulations set out ten criteria the EPA must consider in making its determination of "whether a discharge will cause unreasonable degradation of the marine environment." 40 C.F.R. § 125.122(a)(1)-(10). AEWC's challenge to the

sufficiency of the EPA's analysis of the record evidence in light of the regulatory criteria focuses on the sixth and ninth criteria: "[t]he potential impacts on human health through direct and indirect pathways," and "[s]uch other factors relating to the effects of the discharge as may be appropriate." 40 C.F.R. § 125.122(a)(6), (9).  The record is, however, replete with evidence that the EPA heard and considered the concerns raised by AEWC.  The record evidence also reflects the EPA's consideration of the ocean discharge criteria in making its determination that the authorized discharges would not cause unreasonable degradation of the marine environment, 40 C.F.R. § 125.122(a).

To the extent that AEWC takes issue with the EPA's factual findings other than those specifically related to the effect of the discharge of non-contact cooling water on the bowhead whale migration, those findings are supported by the administrative record and are entitled to our deference. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992) (explaining that, when reviewing an agency's adjudicative action, the reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence").  EPA's issuance of the permit on the basis of those findings was not arbitrary or capricious.

## C

AEWC also argues that the EPA did not provide a rational explanation of how the monitoring program will prevent conflicts with subsistence uses and that the EPA's reliance on the monitoring program is arbitrary and irrational.

The record contains a detailed description of the monitoring program, including requirements for monthly reports of effluent monitoring and testing, reports after drilling is complete, and ongoing monitoring and reporting of marine mammal deflections during discharges of drilling fluids and cooling water. The EPA's determination that the reporting requirements under the monitoring program are adequate was not unreasonable. *See, e.g.*, *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) ("The arbitrary and capricious standard is 'highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision.'" (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quotations and citations omitted)). There is accordingly no basis for concluding that the EPA's design and implementation of the monitoring program was arbitrary or capricious. This conclusion, however, does not preclude the EPA from reassessing or adjusting its monitoring program as necessary or appropriate in light of its reconsidered decision of degradation of the marine environment on remand.

## D

AEWC contends that the EPA should bring its mitigation measures in line with those that the National Marine Fisheries Service ("NMFS") adopted in an authorization it issued under the Marine Mammal Protection Act and that are, in fact, the same measures that AEWC and intervenors Shell Gulf of Mexico and Shell Offshore Inc. agreed to in their 2012 Conflict Avoidance Agreement.

AEWC identifies no legal authority, and we find none, for the proposition that either the NMFS determination under a

different statute for a different purpose (prevention of noise disruption of marine mammals) or the private Conflict Avoidance Agreement between oil companies and the AEWC, must or should be incorporated into the Permit provisions. The NMFS concurred in EPA's determination that EPA's planned action in issuing the Permit "may affect, but is not likely to adversely affect" bowhead whales in the Beaufort Sea. The EPA considered the Conflict Avoidance Agreement, but it was not required to write the terms of that private agreement into the Permit.

## V.  Conclusion

In sum, we grant in part the AEWC's petition for review and we remand this matter to the EPA to reconsider, in light of its acknowledged error, its determination that discharge of non-contact cooling water will not cause unreasonable degradation of the marine environment, and to identify evidence in the record sufficient to support its reconsidered decision concerning the possible effect, or non-effect, of the discharge of non-contact cooling water on the bowhead whale migration and subsistence hunting season in the Beaufort Sea. We deny the petition in all other respects because the EPA's issuance of the Permit is otherwise supported by the record evidence, does not reflect a failure to consider an important aspect of the problem, and is not otherwise arbitrary or capricious.

The parties shall bear their own costs on this appeal.

**PETITION GRANTED IN PART; DENIED IN PART; and REMANDED for further proceedings consistent with this opinion.**